THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. IRA GOODMAN, RICHARD F. POWELL, EDWARD T.
MILLER, AND ISADORE EISENSTEIN, DEFENDANTS-
APPELLANTS.

Argued April 21, 1952—Decided May 26, 1952.

*Mr. John E. Toolan* argued the cause for appellant Isadore Eisenstein.

*Mr. Samuel I. Kessler* argued the cause for appellant Richard F. Powell.

*Mr. Max Mehler* argued the cause for appellant Ira Goodman (*Mr. John A. Matthews,* attorney).

*Mr. John A. Laird* argued the cause for appellant Edward T. Miller.

*Mr. Edward Gaulkin,* Essex County Prosecutor, argued the cause for the State of New Jersey.

The opinion of the court was delivered by

JACOBS, J. This is an appeal, certified to this court on its own motion, from judgments of conviction for conspiracy to extort, entered in the Essex County Court.

The defendant Ira Goodman is Deputy Director of the Department of Public Affairs of the City of Newark. The Newark Department of Health is within the jurisdiction of the Department of Public Affairs and Goodman has exercised supervisory power over it since his appointment in May, 1949. The defendant Richard F. Powell is a sanitary inspector in the Food and Drug Division of the Department of Health which is entrusted, among other matters, with the enforcement of regulations governing the importation and distribution of milk in Newark. The defendant Isadore Eisenstein, a friend of Powell, is in the milk business and the defendant Edward T. Miller, a friend of Eisenstein, is an attorney with law offices in Newark. On Friday, May 26, 1950, a letter was sent by the Department of Health to Schoharie County Coop. Dairies, Inc., advising that, pursuant to hearing, it was being removed from the list of milk

companies approved for shipment of milk to Newark. On Monday, May 29, 1950, representatives of Schoharie, on recommendation by Eisenstein, visited Miller's office, retained him to represent Schoharie and paid him a fee of $7,500, of which he later remitted $7,000 to Eisenstein. On that day and following a call from Miller, Goodman ordered that Schoharie's approval be reinstated and called Powell to advise Schoharie of the reinstatement. On June 7, 1950, a letter was sent to Queensboro Farm Products, Inc., advising that, pursuant to hearing, its Steamburg plant was being removed from the approved list. On June 8, 1950, representatives of Queensboro visited Miller's office, retained him to represent Queensboro's Steamburg, Canton, and Brier Hill plants and paid him $5,000 on an agreed $10,000 fee. Miller called Goodman and Queensboro was reinstated. Queensboro paid the additional $5,000 to Miller on June 13 and Miller remitted $9,075 from the $10,000 to Eisenstein. On June 20, 1950, a hearing was held with respect to Cooperdale Dairy Company and it was announced that the company's approval would be withdrawn. After the hearing a representative of the company retained Miller and paid him $7,500 of which he expected to remit about $7,000 to Eisenstein. No written communication advising Cooperdale of its removal from the approved list was ever sent by the Department of Health.

During the summer of 1950 the Essex County Prosecutor conducted an investigation to determine whether any crimes had been committed in connection with the aforementioned payments by the milk dealers and in the course thereof Goodman, Powell, Eisenstein and Miller gave voluntary testimony. See *State v. Eisenstein*, 16 *N. J. Super.* 8 (*App. Div.* 1951), affirmed 9 *N. J.* 347 (1952). The payments to Miller and his remissions to Eisenstein were not disputed but there were denials that Goodman and Powell or either of them received or were to receive any part thereof. However, in March, 1951, the Essex County grand jury returned an indictment in three counts against Goodman, Powell,

Eisenstein and Miller which charged, in count two, that they had conspired to commit statutory extortion (*R. S.* 2:127–1; *R. S.* 2:119–1) in that they had corruptly agreed that sums of money would be obtained from milk dealers for reinstatement of their approvals as dealers, and that Miller and Eisenstein would take and receive a portion thereof and Goodman and Powell would take and receive a portion thereof. After a lengthy trial all of the defendants were convicted under count two and they have duly appealed. Their main contention is that the State's evidence was insufficient to sustain the judgments of conviction and that their motions for acquittal at the close of the State's case should have been granted by the trial court. This necessitates a summary of pertinent evidence introduced and relied upon by the State and which the jury was at liberty to accept as credible. See *State v. Fox,* 12 *N. J. Super.* 132, 135 (*App. Div.* 1951).

When Goodman was first designated as deputy director, Dr. Charles V. Craster was health officer in charge of the Department of Health, Joseph E. Connolly was assistant health officer in charge of the Food and Drug Division, and David E. Morgan was acting chief inspector in the Food and Drug Division. Morgan generally assisted Connolly and was superior in authority to the inspectors in the Division including Inspector Powell. In January, 1950, Goodman advised Connolly that thereafter all new applications for approval were to be sent to the office of the Director of the Department of Public Affairs and later that month Goodman told Connolly that Powell was to become a free agent and be permitted to go and come as he pleased. In the meantime and thereafter Goodman and Powell had many conferences together. In January, 1950, Eisenstein called Morgan and invited him to his home, saying that Powell would be there; Morgan declined the invitation. In March, 1950, Goodman called Morgan, who was then at home recuperating from illness, inquired about his health, and asked him to telephone when he returned to work. On March 20, 1950, Morgan

returned to work, telephoned Goodman and they had lunch together. Morgan testified that at that time Goodman asked him "how can we get some money" and when Morgan inquired as to what he meant he said "how about the inspectors that go out and inspect the milk plants and the dairies putting pressure on some." Morgan told him it was a "crazy idea" and he "wouldn't do it." During the conversation Goodman asked Morgan who Powell was and whether he knew him. Morgan testified further that after the March 20 luncheon Connolly told him that Goodman had called saying that Powell "was going to take over and advise him" and thereafter he was no longer consulted by Connolly as to matters involving the assignment of inspectors and the exclusion of milk concerns from the lists of approved companies. Connolly testified that in March, 1950, Powell told him that there had been a meeting during which the feeling was expressed that there should be more rigid inspection schedules and he would be Connolly's "adviser and consultant" and that Goodman told him he was to get "tougher" on the matter of cleanliness in milk dairies and "work with Mr. Powell on it." At about that time Goodman gave Connolly a slip bearing the names of four milk companies and told him to take it up with Powell—"he knows what to do with it." Later Powell gave him another list bearing the names of 18 companies including Schoharie, Queensboro and Cooperdale, telling him to keep it in his pocket "so that nobody would know where it was." This list bore, alongside each company's name, the names of its owners and purchasers, the number of dairy farms it controlled and, along the margin in Powell's handwriting, the name of the person who was to inspect the company. Ten companies were to be inspected by Powell, six by Inspector Roman and two by Inspector Manning; at later dates most of these companies were excluded from the approved lists.

Schoharie is a cooperative organization which sells its entire output, as do Bovina Center Creamery and Guernsey Breeders Association, to Middletown Milk & Cream Co.

Schoharie was inspected by Roman from May 11 to May 16 and on May 22 Connolly notified Schoharie that a hearing would be held on May 24. Notices of hearing were also sent to Bovina and Guernsey. Middletown retained David T. Wilentz, an attorney-at-law with offices at Perth Amboy, to represent Schoharie, Bovina and Guernsey. Mr. Wilentz telephoned the Director of the Department of Public Affairs for an adjournment and was referred to Goodman. There was some difficulty about an adjournment and Mr. Wilentz told Goodman he would stop in his office on his way to the hearing. He did so and at that time he asked Goodman to see if decision could not be reserved "until I see what there is to it and perhaps I can adjust it." Goodman said he would try to have decision reserved and he did tell Connolly to hold his decision in abeyance. At the hearing Dr. Shaul of Schoharie pointed out that his organization had been approved for approximately ten years and was ready to meet all regulations of the Department. Mr. Wilentz expressed the view that there was not "anything too serious here that couldn't be corrected" and Connolly said "In most instances that is true." Roman agreed that "in a short period of time" the company could get the objectionable items corrected. At the close of the hearing Connolly said, "I'll hold the decision for a while—then contact you." Mr. Wilentz again stopped in at Goodman's office and said, "I would like to get a chance to straighten this out and before there is any official action taken I would like to be notified and give me an opportunity." Nevertheless, Goodman directed Connolly to exclude Schoharie, on May 26 a letter of exclusion was mailed, and on the same day Middletown was advised of the exclusion by telephone.

Prior to Schoharie's exclusion Eisenstein called Mr. Mather, president of Middletown and they made an appointment to meet on the morning of Friday, May 26. They met at Eisenstein's office and Eisenstein told him that "You are in trouble at Newark." Eisenstein had photostatic copies of sediment tests and what Mather understood to be a tran-

script of the Schoharie hearing held on May 24. Eisenstein suggested that a new attorney be retained and indicated that he would recommend one after thinking it over during the weekend. Eisenstein requested that Mr. Mather keep this conversation to himself. Early Monday morning, May 29, Eisenstein called, told Mr. Mather that he had found Miller, an attorney in Newark, to be very satisfactory and that the fee for Schoharie would be $7,500 and for Bovina $3,500. Bovina decided not to participate but Schoharie agreed to the fee and Mr. Mather so advised Eisenstein. That afternoon Dr. Shaul of Schoharie went to Miller's office. He testified that he made an effort to tell Miller what had taken place "but he didn't appear to be very much interested and asked me if I brought the check for $7,500." Dr. Shaul delivered the check for $7,500 to Miller and obtained his receipt. After Dr. Shaul left, Miller called Goodman on his unlisted telephone at home and Goodman said he would reinstate Schoharie. That evening Goodman called Powell and told him to notify Schoharie that it had been reinstated. Powell immediately called Dr. Shaul, was unable to reach him, but did reach Mr. Mather and notified him of the reinstatement. Mr. Mather testified that when Powell called him he said he was calling "at the direction of Assistant Health Commissioner Connolly." Connolly testified that when he returned to his office on May 31 Powell told him that Schoharie had been reinstated, that he was to send a letter of reinstatement pending reinspection, and he did so immediately.

In his testimony before trial, Miller, who had no prior connection with the milk business, admitted that Eisenstein called him on Friday, May 26, about Schoharie; that Eisenstein had told him to call Goodman; and that on May 30, after Goodman had reinstated Schoharie, Eisenstein prepared and gave him a typed memorandum on the Schoharie matter which he later left at Goodman's office. The State contends, with basis, that examination of this short memorandum discloses that it involved no significant research or other work

and was merely prepared for purposes of the record. On June 1 Eisenstein billed Miller for "consultations, inspection work and briefs Schoharie County Co-op, Cobbleskill, New York" in the sum of $7,000 and Miller paid that sum to Eisenstein by check dated June 5. On June 7 Eisenstein drew checks aggregating $4,300 to various dairy companies, endorsed their names without their knowledge, and cashed the checks.

Queensboro is a New York corporation which operates plants at Steamburg, Canton and Brier Hill. In May, 1950, the Canton and Brier Hill plants were excluded and Queensboro retained Mr. Kapelsohn, an attorney and member of a Newark law firm. He conferred on several occasions with Goodman seeking to have the plant reinspected. On May 25, 1950, notice was sent to Queensboro that a hearing would be held on May 31, 1950, with respect to its most important plant at Steamburg. Queensboro notified Mr. Kapelsohn who in turn called Goodman and spoke to him again following the hearing on May 31, 1950. At that time he told Goodman that he had been advised that the plants were in sanitary condition and sought their reinspection. However, on instruction from Goodman, a letter was sent under date of June 7, 1950, notifying Queensboro that it was being removed from the approved list "until such time as it meets our State and City requirements; is reinspected and found in a satisfactory condition by a representative of our Department and reinstated." In the meantime Eisenstein had told Mr. Tolins, who was in the dairy equipment business, that Miller would handle Queensboro's matters before the Newark Department of Health for $10,000. When Mr. Tolins reported this to Queensboro's representatives he was told "to forget it." The treasurer of Queensboro testified that when they left the hearing on May 31 they were not concerned because Inspector Manning, who had made the inspection, had not recommended exclusion; however, they became "quite concerned and alarmed" when they received notification of the exclusion on June 8 and called Mr. Mather who gave

them the name of the defendant Miller. They visited Miller's office that afternoon and were told that the fee would be $10,000 for the Steamburg, Canton and Brier Hill matters. During the course of the discussion Miller said that the fee was "supposed to be $5,000 a plant. Ordinarily that would be $15,000 but we will throw Brier Hill into the bargain and we will only charge you $10,000." When asked to lower the fee Miller said, "I would like to do something for you but I can't. I am only an errand boy." Miller, in his testimony before trial, admitted that Eisenstein had told him in advance that the fee was to be $10,000 and that during his conference with Queensboro's representatives he made no notes and received no papers. Following the conference Miller called Goodman and Goodman instructed Connolly to notify Queensboro that it was reinstated, and that was done by telegram on the morning following the conference, namely, June 9. Thereafter a short memorandum was prepared and delivered by Miller to Goodman. Queensboro paid $5,000 to Miller at the conference of June 8 and paid the additional $5,000 to Miller on June 13. On June 12 Eisenstein sent Miller a bill for $4,500 which was paid by Miller's check and later sent another bill for $4,575 which was likewise paid by Miller's check. These checks from Miller were deposited by Eisenstein and on subsequent dates Eisenstein drew checks to named payees, endorsed the names of the payees without their knowledge, and cashed the checks.

Cooperdale is a New York company with plants at Skaneateles and Onatavia, New York. It received notice that a hearing would be held on June 20, 1950, and its secretary Mr. Blum telephoned the defendant Miller several days prior thereto. Miller did not attend the hearing and, at its close, exclusion of Cooperdale was announced. Immediately thereafter Mr. Blum met Miller who told him the fee would be $7,500. Miller admitted in his testimony before trial that Eisenstein had fixed this fee at $7,500 and that he expected Eisenstein would receive "probably $7,000" of it. Blum paid the fee to Miller and no official communication was thereafter

sent to Cooperdale. Blum testified that when he pressed Miller for action some time after the hearing Miller said, "It is going to take a little longer; things are getting hot—we can't do it as fast as we planned. Somebody is talking too much."

The State introduced evidence of many telephone calls between Eisenstein and Powell including long distance calls, some late at night, and many involving substantial toll charges, and there was other evidence, in addition to that hereinbefore outlined, which bore generally on the activities of the Food and Drug Division in 1950 with particular reference to the exclusion and reinstatement of out-of-state milk concerns and the relations of the defendants thereto. After their motions for acquittal were denied each of the defendants testified on his own behalf and denied that there was any conspiracy involving payments to Goodman and Powell or either of them. Miller admitted that he received $25,000 from Schoharie, Queensboro and Cooperdale; his position was that he acted solely as an attorney at law and that his remissions to Eisenstein were for his services as a milk expert. Eisenstein admitted that he received $16,075 from the first $17,500 paid to Miller; his position was that he acted solely as a milk expert and did not remit or expect to remit any moneys to Goodman and Powell or either of them. Goodman admitted that he ordered the reinstatements upon receiving the telephone calls from Miller; his position was that his action was dictated solely by the merits of Miller's requests and that he knew nothing of the payments to Miller and Eisenstein and did not receive or expect to receive any portion thereof. Powell admitted that he had directed or advised exclusion of Schoharie, Queensboro and Cooperdale; his position was that he at all times acted in good faith in the course of his duty and without any knowledge of any payments to Miller and Eisenstein or any expectation of participation therein. At the close of all of the testimony the defendants renewed their motions for acquittal. These motions were denied, the trial court charged the jury

and the jury returned its general verdict of guilty against each of the defendants.

In moving for acquittal at the close of the State's case the defendants rested heavily upon the fact that there was no direct testimony establishing that there had been an agreement pursuant to which Goodman and Powell, or either of them, were to share in the moneys received by Miller and Eisenstein for the reinstatement of the milk dealers. It is true that the evidence was circumstantial and not direct; but as has oftentimes been stated, circumstantial evidence is not only sufficient but may also be "more certain, satisfying and persuasive than direct evidence." *State v. O'Connor,* 134 *N. J. L.* 536, 539 (*Sup. Ct.* 1946); *State v. Donohue,* 2 *N. J.* 381, 389 (1949). *Cf. Wigmore, Evidence* (3*d ed.* 1940), *p.* 401. It is likewise true, as the defendants suggest, that certain actions by each of the defendants when isolated from the main circumstances and the rest of the case may perhaps appear innocent, but that is not significant and undoubtedly appears in every case of criminal conspiracy. The real question before the trial court at the close of the State's case was whether the evidence, viewed in its entirety, was such that the jury could properly find therefrom, beyond reasonable doubt, that the four defendants had corruptly agreed to extort moneys from the milk companies for reinstatement of their approval as dealers. See *United States v. Valenti,* 134 *F. 2d* 362, 365 (2 *C. C. A.* 2 1943), *cert.* denied 319 *U. S.* 761, 63 *S. Ct.* 1317, 87 *L. Ed.* 1712 (1943); *United States v. Spagnuolo,* 168 *F. 2d* 768, 770 (*C. C. A.* 2 1948), *cert.* denied 335 *U. S.* 824, 69 *S. Ct.* 48, 93 *L. Ed.* 378 (1948). *Cf. State v. Bricker, Jr.,* 99 *N. J. L.* 521, 522 (*E. & A.* 1924); *State v. Cammarata,* 12 *N. J. Mis. R.* 115, 117 (*Sup. Ct.* 1934), affirmed 114 *N. J. L.* 274 (*E. & A.* 1935). We are satisfied that it was and that the motions for acquittal were properly denied. The reasonable inferences to be drawn from the State's evidence pointed convincingly to the corrupt agreement as alleged, and the jury could readily find incredible the alternative suggestion that the $25,000 was paid to

Miller as legal fees for *bona fide* services as attorney, that he remitted the bulk of his fees to Eisenstein for *bona fide* services as milk expert and that he effectuated the reinstatements simply by his telephone calls and without prior arrangements having been made with Powell and Goodman. In fact, Miller was a relatively young attorney without any knowledge whatever of the milk industry and he actually rendered no substantial services of legal nature; and similarly, Eisenstein, although familiar with the milk industry, actually rendered no substantial services as a milk expert. The position of all of the defendants was that Miller's telephone calls, without more, brought about the immediate reinstatements and that Goodman and Powell knew nothing about the payments to Miller and Eisenstein and were not to participate therein. The pertinent testimony hereinbefore outlined including, among the many other items, Goodman's conversation with Morgan, Powell's displacement of Morgan and Powell's activities thereafter, including his relations with Eisenstein, and Goodman's immediate reinstatements, without prior reinspections, following Miller's calls, in contrast to the earlier unavailing efforts of Messrs. Wilentz and Kapelsohn, pointed directly to the rejection of the defendants' position, and the jury was clearly privileged to do so.

The motions for acquittal were renewed by the defendants at the close of the entire case but their situation was no stronger than at the close of the State's case. On the contrary, their testimony on their own behalf contained evasions and inconsistencies and, notwithstanding their explanations, it may be said to have strengthened the inferences which the jury could properly draw from the State's evidence. Accordingly, we find no error in the trial court's denial of the renewed motions for acquittal. *State v. Bricker, Jr., supra; State v. Cammarata, supra.* Although not stressed at the argument on appeal, the contention was advanced in one of the briefs that the verdict was against the weight of the evidence. The rule is well settled that this court will not set aside a jury verdict in the absence of a clear

and convincing showing that the verdict was the result of mistake, partiality, prejudice or passion. See *Rule* 1:2–19(a); *State v. Pierce,* 4 *N. J.* 252, 268 (1950). No such showing has been made and we have no hesitancy in concluding that, within the aforementioned rule, the verdict may not be disturbed.

We come now to consideration of the alleged trial errors relied upon by the defendants in support of their appeal. The lower court charged the jury that Goodman, as Deputy Director of the Department of Public Affairs and Powell, as inspector in the Department of Health, were officers within the meaning of the extortion statute (*R. S.* 2:127–1) which provides' that "Any judge, magistrate, sheriff, coroner, constable, jailer or other officer who shall by color of his office, receive or take any fee or reward whatsoever not allowed by law for doing his office, shall be guilty of a misdemeanor." The defendants contend that neither Goodman nor Powell was an "officer" within the contemplation of this statute and that consequently they could not be guilty of conspiracy to extort.

In *Fredericks v. Board of Health,* 82 *N. J. L.* 200, 201 (*Sup. Ct.* 1912) the court, while holding that an inspector appointed by a local board of health is the incumbent of an office, expressed the accepted view that "An office is a place in a governmental system created or recognized by the law of the state which either directly or by delegated authority assigns to the incumbent thereof the continuous performance of certain permanent public duties." See also *Thorp v. Bd. of Trustees of Schools for Industrial Education of Newark, N. J.,* 6 *N. J.* 498, 506 (1951). Within the foregoing it is clear that Goodman and Powell held public offices (see *R. S.* 26:3–19; *R. S.* 40:72–8), and that they were consequently to be deemed "officers" in the absence of anything in *R. S.* 2:127–1 evidencing a narrower legislative meaning. The defendants urge that since the statute specifically enumerates persons connected with the "carrying out of the judicial process," its reference to other officers should likewise be

limited to those connected with the judicial process. We fail to perceive any such restricted legislative purpose. Extortion at common law signified the taking of money beyond that allowed by law by any officer under color of his office (2 *Chitty's Criminal Law* (1819) 275; 1 *Burdick, Law of Crime* (1946) p. 392) and our extortion act which had its origin at least as early as 1796 (*Paterson, Laws* (1800) 212) has been said to reiterate the common law. See *Loftus v. State*, 19 *A.* 183, 184 (*N. J. E. & A.* 1890). In *Lane v. State*, 47 *N. J. L.* 362, 363 (*Sup. Ct.* 1885), reversed on other grounds 49 *N. J. L.* 673 (*E. & A.* 1887), Chief Justice Beasley stated that if the defendant there did not come within specific enumerations in the extortion act he was "certainly embraced under the general description which is so comprehensive that no official of the state can claim to stand outside of its circumscription." And that is as it should be; extortion is abhorrent to all who believe in decent government and the broad statutory proscription thereof is rightly applied to public officers whatever be the nature of their duties. Thus in *Conway v. State*, 8 *N. J. Mis. R.* 406 (*Sup. Ct.* 1930), the conviction of a building inspector for extortion was sustained and in *State v. Barts*, 132 *N. J. L.* 74 (*Sup. Ct.* 1944), affirmed 132 *N. J. L.* 420 (*E. & A.* 1945), the conviction of a New York detective for extortion committed in New Jersey was likewise sustained. *Cf. Kirby v. State*, 57 *N. J. L.* 320, 321 (*Sup. Ct.* 1894). In the light of the evidence in the record at the close of the case, we have concluded that the lower court properly charged the jury that Goodman, as Deputy Director of the Department of Public Affairs, and Powell, as inspector in the Department of Health, were officers within *R. S.* 2:127-1.

The defendants next contend that there was prejudicial error in the lower court's treatment of evidence relating to telephone calls made by Eisenstein to Market 3-3232, the general switchboard at Newark City Hall. In examining a representative of the New York Telephone Co. the prosecutor asked him for a toll ticket dated December 22, 1949,

from Walker 5-2093, Isadore Eisenstein to Market 3-3232, the Newark City Hall; it was produced and introduced in evidence without objection. Several other tickets of similar nature were then likewise produced and introduced in evidence without objection. Counsel for one of the defendants then referred to the fact that Market 3-3232 was "a general exchange in the Newark City Hall" and the prosecutor said "that's right." Several more tickets of similar nature were introduced in evidence without objection. Thereafter there was objection taken and overruled and more tickets of similar nature were introduced in evidence until adjournment of court for the day. When court reconvened the following morning, the trial judge announced in the jury's presence that upon reconsideration he was satisfied that the telephone calls "at least at this time, are not properly in evidence because it might give rise to an inference that is not justified from the mere fact that the central exchange of the City Hall was called. I am therefore going to strike them from the evidence." Later that morning the judge in the jury's presence said, "I will strike from the evidence for the present and have them remain for identification the calls that were made by Eisenstein to the City Hall number Market 3-3232." The judge then proceeded to list by number the exhibits he was striking and concluded with the remark, "I might indicate to the jury that when this happens it is unfortunate because the jury hears this testimony and then it is stricken, and when it is stricken the evidence is out of the case and it is strictly a mental effort for you to forget it; in other words, not consider it in evidence at all." Still later in denying a motion the judge pointed out that he would be glad to "consider saying anything further on the subject that counsel may submit to me in writing." Nothing further was then forthcoming.

The State contends that the calls to the general exchange at the City Hall were admissible (cf. U. S. v. Novick, 124 F. 2d 107, 110 (C. C. A. 2 1941), cert. denied 315 U. S. 813, 62 S. Ct. 795, 86 L. Ed. 1212 (1942), rehearing

denied 315 *U. S.* 830, 62 *S. Ct.* 913, 86 *L. Ed.* 1224 (1942)),
but we have no occasion to pass on that issue since we are
satisfied that there was no prejudicial error. See *Rule*
1:2–19. In the first place, many of the tickets were ad-
mitted into evidence without objection and later Eisenstein
affirmatively testified that he made many telephone calls to
the City Hall, although allegedly to relatives. In view of the
foregoing it may be doubted whether the admission of the
additional tickets, which simply indicated calls from Eisen-
stein to the City Hall, caused any harm to the defendants.
See *Rule* 1:2–19. In any event, we believe that the trial
judge's expeditious action in striking the evidence com-
plained about effectively removed it from the case and cor-
rected whatever error may have crept into the proceeding.
See *Rempfer v. Deerfield Parking Corp.*, 4 *N. J.* 135, 149
(1950). It is not without significance that when the court
invited further corrective instructions in writing none was
then submitted. It is true that at the close of the entire case
the following request to charge, number 6, was submitted by
Goodman:

> "The jury is instructed that you may not find as a fact nor infer
> from any of the evidence in this case that Eisenstein's telephone calls
> to Newark City Hall were made to Ira Goodman."

At that juncture, however, the request was too broad and was
properly denied. In the first place it referred to "evidence
in this case" whereas the stricken evidence was no longer in
the case. In the second place the jury might properly have
then inferred, from the totality of the evidence including all
of the circumstances from which it found the conspiracy to
exist and Eisenstein's numerous telephone calls to City
Hall, testified to by him on cross-examination, that Eisen-
stein had called Goodman at City Hall. The contention is
advanced that Eisenstein's cross-examination with respect to
the telephone calls went beyond proper limits to the preju-
dice of other defendants; we find no substance to this con-
tention. Eisenstein was a party defendant testifying on his

own behalf and in view of the nature of the conspiracy charged the prosecutor properly made full inquiry as to the Eisenstein telephone calls to City Hall. *Cf. Prout v. Bernards Land and Sand Co.*, 77 *N. J. L.* 719, 721 (*E. & A.* 1909) ; *State v. Grover*, 104 *N. J. L.* 10, 12 (*Sup. Ct.* 1927). We have concluded that the lower court's treatment of the evidence relating to telephone calls made by Eisenstein to Market 3-3232 did not constitute prejudicial error, that the denial of Goodman's request number 6 was not erroneous, and that Eisenstein's cross-examination with respect to his telephone calls to City Hall did not exceed proper limits.

The next contention advanced is that the trial court erred in admitting into evidence and refusing to strike toll tickets relating to several telephone calls made by Eisenstein to Mitchell 2-0940, the Newark Department of Board of Health where Powell was employed. Eisenstein and Powell were close friends for many years, visited socially and had numerous telephone conversations both local and long distance. Eisenstein in his direct examination testified that during the period of the alleged conspiracy he was representing various milk companies and in that connection made frequent calls to the Newark Health Department and had "intimate contact" with a particular employee of the Department, namely, Powell. Powell testified that he had numerous telephone conversations with Eisenstein and that they may have included calls to the Board of Health. In the light of the foregoing we fail to see how the evidence complained about could be deemed to have prejudiced any of the defendants in maintaining his defense upon the merits. See *Rule* 1 :2-19.

The defendant Powell contends that the trial court erred in admitting into evidence Exhibits S-67, S-80 and S-82 which were the longhand reports by Inspector Roman relating to Schoharie, Cooperdale Onatavia and Cooperdale Skaneateles. Connolly's testimony disclosed that S-67, Roman's longhand report on Schoharie, was given to him in regular course by Roman; Connolly went over the report

with Powell and Powell told him to exclude; and thereupon Connolly sent notice of hearing to Schoharie. The report was a relevant item in the chain of events which led to the proceeding against Schoharie; it was the subject of the discussion between Connolly and Powell which concluded in Powell's instruction to Connolly that Schoharie be excluded and was admissible in evidence without regard to the truth of the statements it contained. It was adequately identified by Connolly and we find no merit in Powell's contention that the prosecutor should have called Roman to identify it. S-80 and S-82 were introduced in evidence after Connolly testified that they were Roman's reports on Cooperdale Onatavia and Cooperdale Skaneateles, that he had discussed them with Powell, and that Powell had told him to exclude. As in the instance of S-67, they were admissible without Roman's testimony. The fact that the recommendations at the close of the reports may have been in different ink and that the later typewritten report by Roman on Schoharie concluded with a different recommendation in nowise affected the propriety of the admission of the exhibits. In his requests to charge numbers 19, 21 and 14, Powell sought to have the trial court instruct the jury that certain inferences might not be drawn from the aforementioned exhibits and any differences between the inspectors' longhand reports and their typewritten reports. We consider that the trial court's charge dealt fairly and adequately with the applicable legal principles and the basic factual controversy, that there was no occasion for singling out individual evidential items such as the reports for further comment, and that the requests were properly denied.

Finally, Powell complains about a portion of the trial court's charge and its refusal to charge as set forth in his request number 7 that if Powell performed only his duties as set forth the jury must acquit "even if someone else took advantage of these duties in furtherance of a conspiracy." The charge must be read in its entirety (*State v. Tansimore,* 3 *N. J.* 516, 525 (1950)) and as thus read it was correct.

The portion of the charge objected to dealt appropriately with the admissibility of acts and declarations of conspirators once the conspiracy was established, and could in nowise have misled the jury. The matter set forth in request number 7 to the extent that it was proper was adequately covered in the charge and need not have been repeated because of its embodiment in the request. *State v. Tansimore, supra.* And if the *request contemplated that Powell could not be guilty of conspiracy to extort if the only acts performed by him were part of his duty, then it was erroneous; it is clear that if, as the jury found, Powell was a party to the corrupt agreement between the defendants involving the taking and division of moneys from the milk dealers for reinstatement of their approvals, he was guilty of conspiracy to extort despite the suggestion that his concurrent actions were in the performance of his official duties. *Cf. State v. O'Brien,* 136 *N. J. L.* 118, 123 *(Sup. Ct.* 1947).

From our examination of the entire record we are satisfied that the defendants and each of them were fairly tried and found guilty upon adequate evidence and that no legal errors prejudicial to their rights were committed during the course of the trial. Accordingly, the judgments of conviction are

Affirmed.

WACHENFELD, J. (dissenting). The following briefly expresses my views bringing me to an opposite conclusion.

I am in accord with much of the majority opinion, including the finding that there was no error in refusing to direct a judgment of acquittal and that the verdict was not contrary to the weight of the evidence. My difficulty lies in the admission of certain telephone calls and the failure to charge in reference thereto, and certain cross-examination after the calls had been stricken from the record.

Goodman claims error in the admission of telephone calls allegedly made by Eisenstein to the City Hall and the inadequate striking out of such testimony. He contends the

cross-examination of Eisenstein went beyond the proper limits, to his prejudice, as it dwelt upon and related to evidence which had been stricken from the record by the court, and he urges 'the prejudicial effect was increased by the court's refusal to charge as requested.

These telephone calls were all made to MA 3-3232, the general exchange of the City Hall, and impropriety in their admission is urged as they were not connected up with one or more of the defendants.

Efforts were made by counsel to bar the calls, and the defense lawyers at the time inquired pointedly as to whether or not the prosecution would represent that they would subsequently be connected up with the defendants. A long colloquy ensued in which all counsel made the same demand but the inquiry was never specifically answered by the prosecutor. He gave many reasons why the testimony should be admitted but would not give a direct reply, contending: "These telephone calls that have been taken here show a pattern or relation of calls back and forth in this case, out of town, out of the state, and they tie in with the dates, with the critical dates we have been talking about for ten days."

Despite a string of objections, the court, after expressing grave doubts, finally admitted the evidence, saying: "These are the only calls that give me concern. Aside from them I think the evidence is clearly admissible to show conduct among the defendants. I come to some hesitation about these calls to the City Hall. However, I think the situation has been made clear to the jury that the number at the City Hall, which has been referred to, is the general exchange of the City Hall. And as long as they understand that, I will overrule the objection and note the several objections."

Admitting Market 3-3232 was the general exchange of the Newark City Hall, the Prosecutor theorized that the evidence objected to was being offered as inferential proof of conversations between Eisenstein and Goodman.

If the court was "concerned" about the admissibility of the calls and had "some hesitation" about them, that doubt

ordinarily would follow the presumption of innocence and should have been resolved in favor of the defendants.

The court, after having admitted the calls, on the following day came to an opposite conclusion. It then ruled the evidence should be stricken and accordingly struck the 23 toll call slips marked as exhibits, evidencing the calls to the City Hall, but the slips were retained for identification for any future use they might be put to. This is what is referred to in the majority opinion as an "expeditious action."

In doing so, the court said: "I might indicate to the jury that when this happens it is unfortunate because the jury hears this testimony and then it is stricken, and when it is stricken the evidence is taken out of the case and it is strictly a mental effort for you to forget it; in other words, not consider it in evidence at all."

Generally, error in receiving inadmissible evidence may be cured by its subsequent withdrawal or striking, *Rempfer v. Deerfield Packing Corp.*, 4 *N. J.* 135 (1950), but when error is or may be so damaging that its striking may not suffice, a new trial must be awarded.

"* * * where the evidence thus admitted is so impressive that in the opinion of the appellate court, its effect is not removed from the minds of the jury by its subsequent withdrawal, or by instruction by the court to disregard it, judgment will be reversed on account of its admission." *Boniewsky v. Polish Home of Lodi*, 103 *N. J. L.* 323 (*E. & A.* 1927).

The evidence subsequently declared improper and ruled out by the court remained with the jury all day and overnight and they might well have discussed it amongst themselves. The prosecutor's theory that the calls were akin to a meeting between Eisenstein and Goodman was most impressive and important because it directly contradicted Goodman, who testified he never talked to Eisenstein.

Discussing the effect of improper testimony subsequently stricken from the record, the court, in *State v. Sprague*, 64 *N. J. L.* 419 (*Sup. Ct.* 1900), said:

> "It had been admitted to the jury after repeated strenuous objection on behalf of the defendant, and had been fully heard by them. * * * It had gone deliberately to the jury, and had been fully taken into their consideration, and I cannot perceive how its harmful and prejudicial effect could be obviated or cured by having the evidence at this stage of the proceeding merely and formally stricken from the record."

Nor can I subscribe to the majority's conclusion that the jury, from the "totality of the evidence including all the circumstances," had the right to conclude that Goodman talked to Eisenstein at the City Hall. It was specifically denied and other than the stricken testimony, there was not a word to support it.

No magic cloak is supplied by an accusation which permits a jury to draw any inference it desires from the testimony submitted. A lawful inference must spring from or be logically related to a proven fact.

If there was error in this regard, its prejudice was heightened by the cross-examination of Eisenstein in which the prosecutor referred to the same telephone calls which had been ruled out of evidence. In a lengthy cross-examination, these calls were intermingled with others made by Eisenstein which he admitted, and after gaining this admission, in many instances the prosecutor would ask: "* * * did you or did you not call the Newark City Hall and talk for 4-6/10 minutes"? and again: "Did you at 9:31 a. m. call the Newark City Hall and talk for 3-3/10 minutes"? and so on, on many occasions. The purpose of the cross-examination is only too obvious. It was improperly bringing back to the jury the same telephone calls which had been ruled inadmissible and had been stricken from the record. It could have no other purpose excepting to impress upon the minds of the jury, by reference to testimony already ruled out, an inference not warranted by legal evidence.

If doubt remains as to whether or not the error was prejudicial and harmful, it is dispelled by the failure of the court to charge the defendant's sixth request to charge: "The

jury are instructed that you may not find as a fact nor infer from any of the evidence in this case that Eisenstein's telephone calls to Newark City Hall were made to Ira Goodman." Under the circumstances, the defendant was entitled to that charge.

The difficulty encountered in admitting evidence subsequently determined to be erroneous, resulting in its being stricken from the record, is realistic and vital. The majority opinion admits it must be "effectively removed." All of the adjudicated cases place upon the court the obligation of endeavoring to eradicate it from the minds of the jury by employing every method having a tendency to accomplish this end.

It must clearly appear that the testimony illegally admitted was so eradicated from the case that its admission could not have injuriously affected the accused. *Bullock v. State*, 65 *N. J. L.* 557 (*E. & A.* 1900).

The short, simple request to charge, couched in a few plain words, would have been an aid in this respect and its refusal, I think, was error.

"In a criminal trial, considering the serious potentialities of a conviction, a defendant should not be required to contend with inadmissible evidence, where it appears that it may have a prejudicial effect upon a court or jury." *State v. Dietz*, 5 *N. J. Super.* 222 (*App. Div.* 1949).

So, too, I believe error was committed in the admission and refusal to strike from the record the telephone calls made by Eisenstein to Mitchell 2-0940, the Newark Health Department. The calls to the City Hall were struck but the court refused to strike those made to the Health Department. They are identical in fact. In each circumstance there was a central switchboard; in each there were many and divergent departments; in each there were many employees and executives, any one of whom could have received the calls in question. The admission of such evidence against Powell, in my opinion, was prejudicial and constituted reversible error.

For these reasons I am compelled to the conclusion that the defendants suffered manifest wrong or injury and must vote to reverse the judgment below.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Justice WACHENFELD—1.