43 N.J. Super. 367 (1957)
128 A.2d 711
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ALAN YEDWAB AND OTTO STILLWACHS, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 1956.
Decided January 21, 1957.
*369 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Archibald Kreiger, Deputy Attorney-General, argued the cause for respondent State of New Jersey (Mr. Charles S. Joelson, Deputy Attorney-General, Acting Passaic County Prosecutor, attorney).
Mr. Sam Weiss argued the cause for the appellant Alan Yedwab (Mr. Samuel Rosenfeld, attorney).
Mr. Louis Santorf argued the cause for the appellant Otto Stillwachs.
The opinion of the court was delivered by FRANCIS, J.A.D.
The grand jury of Passaic County indicted Alan Yedwab, Otto Stillwachs and Michael Fava for conspiracy to cheat and defraud the Niagara Fire Insurance Company of New York by means of a simulated burglary at Yedwab's home. They were tried together after denial of motions for severance. Yedwab alone testified in his defense at the trial; the other two did not take the witness stand. Yedwab and Stillwachs were convicted and now appeal. Fava was acquitted.
Yedwab seeks a reversal contending that (1) his motion for a judgment of acquittal, made at the close of the State's *370 case, should have been granted; (2) statements of Fava uttered to a third person out of his presence were erroneously admitted against him, and (3) it was error not to grant him a separate trial.
Stillwachs' appeal is predicated solely upon the ground that the Fava declarations referred to were not admissible against him.
The clearest sequence for treatment of the various questions raised seems to be to take up first Yedwab's motion for a judgment of acquittal. In doing so, regard must be had for the principle that when such a motion is made the propriety of its denial is reviewed on appeal solely on the state of proof as it affected him at the time the trial court was called upon to rule. The fact that the defendant later testified in his own behalf and in doing so strengthened the case of the prosecution, cannot be considered. State v. Fox, 12 N.J. Super. 132 (App. Div. 1951), and see State v. Pearson, 39 N.J. Super. 50, 57 (App. Div. 1956).
Prior to and at the time of the events to be discussed, Yedwab operated an insurance agency in Paterson, New Jersey. He lived on the first floor of a two and a half story frame dwelling at 379 East 29th Street in that city; tenants occupied the other two floors. As agent for the Niagara Fire Insurance Company he had written a policy of insurance which protected him to the extent of $13,745 against loss by burglary at his home of jewelry, furs, furniture, clothes and sundry personal effects. The policy in force at the time in question ran from January 25, 1953 to January 25, 1956; it was a renewal of an earlier one. "Burglary" is defined therein as
"the felonious abstraction of the insured property from within a building or room by any person or persons making felonious entry therein by actual force and violence of which there shall be visible marks made upon the exterior of such premises at the place of entry by tools, explosives, electricity or chemicals."
The main case of the State shows that Stillwachs maintained a garage at 566 East 22nd Street, Paterson. It is *371 apparent (without regard to his two statements to the police) that he and Yedwab were acquainted. Fava's connection with Stillwachs is not clear but he was in and about the garage and drove Stillwachs' car on the occasions referred to in the evidence. There is no proof that he knew or had ever spoken to Yedwab.
On May 23, 1954 Stillwachs gave one of his two statements to the police. It was admitted in evidence against him alone and the jury properly instructed as to that limitation. It says:
"Sometime during November 1953 Allen [sic] Yedwab and myself discussed I believe at his home a program an arrange [sic] to larcentate his home. The purpose was to obtain legal compensation for a theft loss. After arrangements had been made with Mr. Yedwab and myself the date for the larceny was arranged for New Year's Eve while Mr. Yedwab had arranged to be away from the premises with his family. On New Year's Eve before midnight I and Michael Fave [sic] removed a pane of glass from the front door and entered into the foyer, removed a door by removing three hinge pins and then entered into the living quarters. We proceeded into the bedroom and removing about 4 suits, suede jacket, 2 fur jackets, a wire recorder, a set of women's golf clubs and golf bag, 2 lamps. We then left by the front door and got into my car which was parked next door and I drove to my garage on East 22nd Street and left the car there with all the articles in it. I took another car and went home alone. I kept the stuff about a month in the office upstairs and I then returned it to Mr. Yedwab except the lamps which I broke up and destroyed. * * *"
This highly inculpatory revelation by Stillwachs undoubtedly accounts for the restricted nature of the attack upon his conviction. However, it cannot be resorted to in any way against Yedwab. The basis upon which his guilt could have been adjudged must be found elsewhere in the record.
Yedwab and his wife left home at about 7 or 7:30 P.M. on New Year's Eve, December 31, 1953. Their daughter went out for the evening also. Between 2 and 2:30 A.M. the daughter and her escort were passing on their way to another destination and she noticed that the porch light was out. So she stopped and went in. On doing so, she *372 discovered that the entrance doors to the house and their apartment had been opened and the place ransacked. The police arrived shortly thereafter, surveyed the situation and began their investigation. Efforts to reach Yedwab and his wife failed and they did not return home until about 6 A.M.
The police noticed that a leaded glass panel near the lock of the main entrance door had been broken so that a hand could be inserted to open the door from the inside. Obviously that means of entry satisfied the insurance policy requirement for a felonious entry by such actual force and violence as left visible marks upon the exterior. That door led into a small foyer in which were entrance doors to the Yedwab apartment and to that of another tenant. The Yedwab door was a glass paneled one. However, unlike the outside door, no glass section was broken to permit the intrusion of a hand in order to accomplish opening from the inside, which was possible according to the testimony. Instead, the pins were removed from the three door hinges; the door itself was removed and left standing against the wall in the foyer. Despite this odd and elaborate means of entry  if it was in fact made that way  no marks or damage were found anywhere on or around the door. Merely removing the pins would not have caused it to come out of its frame. Assuming it was locked and the bolt in place, some means would have been necessary to force the door out of position. So it was reasonable to expect marks or damage to or around the framework and to the groove where the bolt fitted when locked.
Bedroom dresser drawers were open, articles were strewn about, closets were upset; one detective called it "a ransack job." The police returned later in the morning and went over the matter with Yedwab who gave them a general idea of the extent of the theft. They asked him to furnish an itemized list of the missing articles with serial numbers wherever possible. Dusting for fingerprints proved fruitless.
On Monday, January 4, 1954, Yedwab prepared a list of articles alleged to have been stolen and submitted it to the General Adjustment Bureau in order to present a claim under *373 the burglary policy. The itemization was an elaborate one, containing over 70 separate items of clothing, jewelry, golf clubs, cameras, lamps, radio and other personal property. The loss was put at more than $8,000. A copy of the list was not given to the police until they called for it at Yedwab's office on January 7.
The claim was settled promptly by the insurance carrier. On January 20 a check for $7,094.70 in payment was issued and deposited two days later in Yedwab's business account.
It is worthy of note that the formal proof of loss filed under oath by Yedwab sets forth that the burglary occurred on January 1, 1954 about 1 A.M. How he happened to fix this time is not explained. His statement to the police says that discovery of the entry was made by his daughter at about 2:30 A.M. and the radio car officers arrived at the scene after the telephone call at approximately 2:35 A.M.
At the trial, the State produced one Flanagan who said that in November or December 1953 he, Fava and a third person were riding in Stillwachs' car. They stopped and had some coffee and either in the restaurant or in the car, after some comment about the payment for the coffee, Fava said to Flanagan (who had a criminal record for breaking, entering and larceny, assault and battery, and robbery) that he would have some money in the future from the "Yedwab job"; it was supposed to be an insurance job.
This testimony was objected to by Yedwab and Stillwachs as hearsay, the statements not having been made in their presence. However, it was admitted against them as well as Fava, the trial court adopting the view that it was within the rule that statements of one co-conspirator made out of the presence of his confederates relating to the subject of the conspiracy and in furtherance of its object, are receivable against all of them. This, in our judgment, was erroneous. A distinction must be recognized between a comment or statement or narrative to a third person concerning the conspiracy and one made in furtherance of it. Although a broader rule has been suggested (Report of the Committee on the Revision of the Law of Evidence to *374 the Supreme Court of New Jersey (1955), proposed Rule 63(9), at 138; Morgan, "The Rationale of Vicarious Admissions," 42 Harv. L. Rev. 461, 464 (1929)), it seems to be settled in our State that only those declarations of a co-conspirator which are made during the existence of the conspiracy and in furtherance of the common unlawful purpose, are competent evidence against his partners in crime. State v. Rios, 17 N.J. 572, 596 (1955); State v. Carbone, 10 N.J. 329, 339, 340 (1952). The broader view stated in the annotation of the committee report, supra, as being the law of our State, is that declarations of one co-conspirator are admissible against his associates if made "while the plan was in existence" without regard to whether they were made in furtherance of it. However, the per curiam opinion of the Court of Errors and Appeals in State v. Fischman, 108 N.J.L. 550 (E. & A. 1931), cited as expressing that doctrine, does not in fact do so. The opinion does say:
"Some such were acts of and declarations by Fischman that were clearly in the progress of and before the completion of the offense for which the defendants were jointly indicted and which they conspired to commit. The opinion in the court below adequately states the propriety of the pertinent rulings."
The Supreme Court opinion (State v. Seidman, 107 N.J.L. 204) says this on the subject:
"Counsel for plaintiff in error further contends as a ground for reversal that the trial court erred in admitting in evidence, over his objection, conversations and conduct of Fischman, not in the presence of the plaintiff in error, and charging that such conversations and conduct were evidential against him. We find nothing of merit in this contention. As is stated in 16 Corp. Jur. 644, § 1283: `The general rule is that where it appears that two or more persons have conspired to commit an offense, everything said, done, or written by one of them during the existence of the conspiracy and in the execution or furtherance of the common purpose, is admissible in evidence against the others.'"
See Report of the Commission to Study the Improvement of the Law of Evidence, proposed Rule 63(9), at 58.
*375 Accordingly, we hold the view that when Yedwab and Stillwachs asked the court to limit the probative force of the statements to the issue of Fava's guilt or innocence alone, the request should have been granted. This conclusion does not of itself call for a reversal. Such action is not warranted unless it appears from the entire record that these defendants "suffered manifest wrong or injury" as the result of the error. R.R. 1:5-1(a); 2:5.
Wrong or injury of that consequence is not revealed upon analysis of the whole case. At best, Flanagan's testimony was not impressive on direct examination, particularly in the face of his criminal record and the fact that he was awaiting trial under three indictments. Moreover, on cross-examination he testified that all Fava said was that in the future he would have some money. Then on redirect examination, after the prosecutor indicated he wished further interrogation for purposes of rehabilitation, the witness repeated that nothing else was said. And further, the verdict is of dispositive significance as to the weight and potency of this testimony. Manifestly the jury did not consider it of any moment for, despite it and Fava's counsel's admission in opening that "all [he] did in this matter was help Stillwachs carry [the property] away," they acquitted him. Under all the circumstances, justification for interfering with the convictions of the two appellants is not provided by this point.
In the course of his testimony Flanagan also said that on New Year's Eve 1953 he, Fava, Stillwachs and another person were "just riding through Passaic County" in Stillwachs' car. He went home at about 11:30 P.M., at which time Stillwachs and Fava were still together. Thereafter, the night of January 3, 1954, he entered Stillwachs' garage (to which he had a key). In the upstairs office he saw some clothing, a couple of lamps and a set of golf clubs. At this time, although not a participant, he was aware of the burglary or alleged burglary at the Yedwab home.
Flanagan knew Yedwab to see but he had never spoken to him. He saw Yedwab on one occasion in "some of the ensuing months, either November or December" in front of *376 Stillwachs' garage. What was meant by the word "ensuing" is not clear. Yedwab's counsel argues that it could not mean later in the same November or December as the alleged Fava conversation. In his view, it signifies November or December 1954, six or seven months after Yedwab's arrest. Assuming this to be so, the indictment against these two appellants was filed on November 9, 1954. Being in front of the garage of the man who was charging him with engineering a pretended burglary, was hardly a propitious place for Yedwab to be.
On May 24, 1954, after interrogating Stillwachs, one of the investigating detectives obtained a warrant to search Yedwab's home. The search was made in his absence and resulted in the seizure of some men's suits, a squirrel fur jacket monogrammed "Deanna Y," a man's suede jacket, and a Bell & Howell projector. These articles appeared on the list which had been furnished to the insurance carrier and to the police. On the same day, a Polaroid camera and a tape recorder were found in Stillwachs' garage. They too had been listed as stolen.
Yedwab was sent for and on being asked if he had any idea who had broken into his home, he replied in the negative. On being shown the articles seized there that day, he denied they were his and said he did not know where they came from. Later, he admitted that certain of the property allegedly stolen, to the estimated value of $2,500, had been returned to him by Stillwachs for $300. Then he gave a signed statement about the matter in which he said that about six or seven weeks after the loss he was advised by Stillwachs over the telephone that "he could recover some of the missing articles for a consideration." The consideration sought was $400 because the "boys" had to be paid off. Yedwab said that $400 was a little too much, as he had intentions of buying new furs for his wife. There is nothing in the statement showing any discussion about the particular "articles" to be returned, but they settled on a payment of $300. On an evening in March 1954 he drove to Stillwachs' garage and picked up a carton "containing various articles of clothing *377 that had been stolen from [his] home." The payment was not made until a day or two later at his office; it was in cash. By this time, obviously he knew what was in the carton and that the really valuable items allegedly stolen, such as a gold watch and bracelet with eight diamonds, a platinum bracelet with three diamonds and six sapphires, a platinum diamond ring, and an expensive mink stole, had not been returned. But despite the paucity of his recovery, he paid the $300. It seems patent also that the articles delivered in the carton could not have been worth $2,500 and that he must have known it. Yet he gave that estimate of their value to the police in the statement.
Yedwab did not notify the police of the recovery because he "didn't want to involve Otto Stillwachs" and also because he was warned "against notifying anyone." Nor did he report the matter to the insurance company for the same reasons, although his policy provides:
"Subrogation. In the event of any payment under this policy the Company shall be subrogated to the Assured's rights of recovery therefor against any person or organization and the Assured shall execute and deliver instruments and papers and do whatsoever else is necessary to secure such rights. The Assured shall do nothing after loss to prejudice such rights." (Emphasis added.)
The factual outline of his conduct gives rise to a number of questions. After discovery of the few articles, mostly used clothing, returned in the carton, why did he pay Stillwachs $300 a day or two later instead of going to the police? Enlisting the aid of the police would have saved him the $300 and perhaps have resulted in recovery of the more valuable items already paid for by the insurance carrier  if they were in fact taken at all by a third person or persons. Here it may be noted that when asked if the list of stolen goods given to the carrier and the authorities was an honest and true list, he said: "I think the question is immaterial" and "I think it has no bearing on this case." What reasonable justification was there under the existing circumstances for protecting Stillwachs? Is it not fairly inferable that articles returned were the only ones taken, that they were *378 being returned according to a preexisting agreement, and that the $300 payment, disproportionate as a jury might well find it to be, was really compensation for his part in the fraudulent scheme? And that there was no other property to be given back? Was not his valuation of these items to the police at $2,500 the product of a consciousness that the $300 payment was excessive for such stolen and second hand goods? As already indicated, he knew Stillwachs. Yet he undertook to protect this man who allegedly burglarized his home to the extent of more than $8,000 and who then charged him $300 for the return of some of the comparatively minor items taken. And he undertook also to pay him that sum after possession of those items had been regained and could have been retained without any payment simply by reporting to the police. Is it not a justifiable inference that the failure to inform the police stemmed from Yedwab's fear of the consequences to himself which might follow Stillwachs' arrest? Are not the facts clearly susceptible of the conclusion that an unlawful agreement to defraud had been made between the two men, the culminating acts of which were to be the return to the pseudo victim of the property taken and the payoff for the accomplishment by the pseudo burglar of his part of the bargain? See, State v. Gregory, 93 N.J.L. 205, 207, 208 (E. & A. 1919).
In our judgment, the whole factual mosaic justifies the conclusion that a jury question had been created as to whether Yedwab and Stillwachs had entered into a criminal agreement to pretend a burglary in order to permit collection on the former's insurance policy.
Conspiracies are concocted secretly and are proved with difficulty. Ordinarily the prosecution must rely on circumstances and inferences. But as Wharton put it:
"* * * This evidence may be such as shows that the parties acted together or in concert, in a manner, under the circumstances, warranting the belief that their acts were the result of previous understanding and agreement between them. A series of acts constituting one systematic scheme and having a natural connection is admissible.
*379 Circumstances attending a series of criminal acts may satisfy the ordinary mind that they result from concerted and associated action, although if each circumstance was considered separately, it might not show confederation." 1 Wharton, Criminal Evidence, (12th ed. 1955), § 180, at p. 354; State v. Goodman, 9 N.J. 569, 581 (1952).
And as the Supreme Court said in State v. Carbone, supra, 10 N.J., at page 341:
"* * * A conspiracy may be proved by direct evidence, or by circumstances from which the jury may presume it. R. v. Parsons, 1 W. Bl. 392; R. v. Murphy, 8 C. & P. 297. Proof of the existence of a conspiracy is generally a `matter of inference deduced from certain criminal acts of the parties accused, done in pursuance of an apparent criminal purpose in common between them.' R. v. Brissac, 4 East 164, 171, Grose, J. Though the act of conspiracy is the gist of the offense, `it is not necessary to show an actual association or confederacy, but it may be left to reasonable inference.'"
In reaching a decision as to whether a criminal cause is to be submitted to the jury for determination, the trial court must give the State the benefit of all reasonable inferences arising from the proof. If, upon doing so, any such inferences of guilt arise therefrom, the fact finding function of the jury must be utilized. State v. Rogers, 19 N.J. 218, 232 (1955); State v. Picciotti, 12 N.J. 205 (1953); State v. Goodman, supra. As Justice Jacobs said in the Goodman case:
"* * * The real question before the trial court at the close of the State's case was whether the evidence, viewed in its entirety, was such that the jury could properly find therefrom, beyond reasonable doubt, that the four defendants had corruptly agreed to extort moneys from the milk companies for reinstatement of their approval as dealers."
Although the basis for evaluating the proof to determine if guilt exists, has been expressed in more guarded language in circumstantial than in direct evidence cases (State v. Rogers, supra, 19 N.J., at page 232), the test in the final analysis is whether the circumstantial evidence is clear enough and strong enough to convince the jury beyond a reasonable *380 doubt of the guilt of the accused. State v. Rogers, supra, 19 N.J., at page 234; State v. Kuehnle, 85 N.J.L. 220, 226, 227 (E. & A. 1913). And it has been suggested that such proof may be more certain, satisfying and persuasive than direct evidence. State v. Rogers, supra, 19 N.J., at page 234; State v. Goodman, supra, 10 N.J., at page 581.
In our opinion, the total effect of the circumstances proved in the State's case indicated sufficiently the existence of a corrupt conspiracy between appellants to defraud the insurance carrier as to demand justly that the motion for judgment of acquittal be denied. State v. Bentley Bootery, Inc., 128 N.J.L. 555, 564, 568 (Sup. Ct. 1942), affirmed 129 N.J.L. 386 (E. & A. 1943); State v. Continental Purchasing Co., 119 N.J.L. 257, 262, 264 (Sup. Ct. 1938), affirmed 121 N.J.L. 76 (E. & A. 1938); State v. Greenberg, 105 N.J.L. 383, 385 (E. & A. 1929).
The last point to be decided arises from the denial of Yedwab's motion for a severance. Disposition of such a motion rests in the discretion of the trial court. R.R. 3:5-7. In the absence of a clear showing of mistaken exercise thereof, an appellate tribunal will not interfere with his decision in such a matter. State v. Rios, supra, 17 N.J., at page 583; State v. Rosenberg, 37 N.J. Super. 197 (App. Div. 1955). The record discloses no such error here.
The judgments of conviction are affirmed.