60 N.J. Super. 1 (1959)
158 A.2d 375
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ERNEST GRAZIANI, ET ALS., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 20, 1958.
Decided June 29, 1959.
*6 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. John E. Toolan argued the cause for appellants Ernest Graziani, James Graziani, Halsey Packard, Inc., and Halsey Automobile Co. (Messrs. Toolan, Haney & Romond, attorneys).
Mr. Charles Stanziale argued the cause for appellants Joseph Morese, Dominick Canace and Angelo Aquilino.
Mr. George R. Sommer argued the cause for appellants Henry Rellah, Michael Moore and Joseph Marcelli (Mr. Joseph Schoenholz, attorney).
Mr. Myron W. Kronisch, Legal Assistant to Prosecutor of Essex County, argued the cause for respondent (Mr. Charles V. Webb, Jr., Essex County Prosecutor, attorney; Mr. Kronisch, of counsel and on the brief).
The opinion of the court was delivered by FREUND, J.A.D.
Eight individual and two corporate defendants appeal from a judgment of conviction entered against them in the Superior Court, Law Division, Essex County, after a jury verdict. The charge in the indictment was that between about September 1, 1955 and March 14, 1957 they unlawfully conspired to obtain money by false pretenses "from members of the general public, particularly purchasers and prospective purchasers of motor vehicles" by falsely representing to some customers that certain motor vehicles were "leftover new cars" when in fact they were used cars, contrary to the provisions of N.J.S. 2A:98-1 and N.J.S. 2A:98-2.
*7 The corporate defendants are Halsey Packard, Inc., and Halsey Automobile Co. The former, which began business in February 1955, is a franchised Packard automobile dealer, and also sells new and used cars of other manufacture at its showroom in a large two-story building on Central Avenue in the City of Newark. During the period mentioned in the indictment, this corporation employed between 10 and 20 salesmen. The Halsey Automobile Co. went into business about October 1956 as an unfranchised dealer of new and used cars of various makes, operating from a lot on Springfield Avenue in Newark, a considerable distance from the Halsey Packard, Inc., location.
The defendant Ernest Graziani is president and owner of all the shares of stock of both corporations except for one share in each. He testified that his functions were to "do the advertising * * * set the policy * * * [and] the financing." His brother, the defendant James Graziani, held one share of qualifying stock in each corporation, and was secretary and a member of the board of directors of both corporations. He was a salaried employee of Halsey Packard, Inc., and the processing and preparation of automobiles for sale were under his direction and supervision. Neither Ernest Graziani nor James Graziani was a salesman of automobiles.
Included as defendants were the sales manager, Joseph Morese, and the salesmen: Harry Rellah, Michael Moore, Joseph Marcelli, Dominick Canace and Angelo Aquilino.
In the indictment, 21 were charged with the conspiracy. The trial of ten of the defendants was severed on the State's motion. One defendant, Anthony D'Urso, was acquitted by the court at the end of the case.
The theory of the State's case was that the conspiracy was established by the defendants' joint efforts on three levels: viz., false advertisements in newspapers and over radio and television of "leftover" new automobiles for sale; the acquisition of second-hand or used cars and the rehabilitation of them to look like new automobiles; and the sales of such *8 used cars by the sales staff who falsely and knowingly represented them to be new automobiles. The advertising was under the direction of Ernest Graziani, and the rehabilitation of used cars was under James Graziani's supervision.
We shall deal with each of these three essential stages separately.

(1)

ADVERTISEMENTS.
It was stipulated "that the word `leftover' as used in the advertisements of Halsey Packard, Inc., referred to new cars."
The proofs established that in the 18-month period covered by the indictment the defendant Halsey Packard, Inc., spent over $300,000 for broadcasts and for the printing of over 900 full-page advertisements in two Newark newspapers and in a chain of ten weekly newspapers distributed in Bergen County. Of the many exhibits in the record, the following are typical of frequently published advertisements in bold type:

"BUY YOUR NEW CAR FROM A RELIABLE NEW CAR DEALER HALSEY PACKARD INC."
advertising '55 Chevrolets and '55 Oldsmobiles. (Newark Star-Ledger, Sunday, September 18, 1955.) An advertisement of January 27, 1956 read:

"The LAST of the LEFTOVERS"
offering '55 Fords, Chevrolets and Plymouths, and again "BUY YOUR NEW CAR FROM A RELIABLE NEW CAR DEALER!" Another advertisement of November 11, 1956 offered "LEFTOVERS 

'56 FORDS - CHEVS - PLYMS."
followed by the admonition that the purchase be made "from a reliable new car dealer." Some advertisements carried the words "Factory Equipped" beneath "Leftover."
*9 The defendants also advertised over television and radio stations. The cost of telecasts was shared by Packard (the manufacturer), and in these about one-half the time was devoted to Packard cars and the other half to defendants' leftovers. Radio scripts carried the same message that leftover (new) cars were offered for sale and urged that "a reliable new car dealer" be patronized.
Both Ernest Graziani and James Graziani knew that the word "leftover" in advertisements conveyed and was intended to convey to the public the idea that the cars were new.

(2)

RECONDITIONING OF USED CARS.
James Graziani supervised the purchasing of used cars. He directed the cleaning up of the vehicles, which, beside removal of dents, spraying and replacement of slip-covers, included steam cleaning of the motor. Speedometers were turned back to zero. Ernest was familiar with the practice of the turning-back of speedometers and the steam cleaning of motors under James' direction.

(3)

SALES.
Thirteen separate fraudulent sales by the above-named salesmen to persons (in many walks of life) responding to the advertisements were proved. Eleven of these sales were made for Halsey Packard, Inc., and two for Halsey Automobile Co.
The defendant Henry Rellah made three of these sales: to Stewart M. Clippinger, Frank Williams and Dorothy Schrauth. Defendant Michael Moore sold four cars: to Peter Hughes, Andrea Frascino, Ite Hamming and John Klaymeier. Defendant Joseph Marcelli sold four automobiles: to Frank Ferrigno, Harry Jahoda, Stanley Kasmarek and Gilbert Delgado. Defendants Dominick Canace and Angelo Aquilino participated in the sale of one car to Gladys Gargalowitz, *10 and Canace sold another to Lillian Brown. Defendant Joseph Morese, the sales manager, was shown to have assisted the salesmen in several of the sales.
It was stipulated that "[e]ach of the cars involved in the transactions, testified to by the State's witnesses, were used cars, and the particular salesman who made the sale knew at the time he made the sale that the car was used."
Each of the above-named purchasers testified concerning his or her purchase and, while the transactions were not identical, the pattern was the same. They testified about their attraction to the defendants' premises by the advertisements; they came to buy new cars; each purchased upon the representation and under the belief that the car was a new automobile, but later ascertained through some defect in the vehicle that it was in fact a used automobile. The car sold to Williams had been involved in an accident. In the Clippinger, Williams and Brown transactions, standard new car forms of sale were used. In the Clippinger order, however, a "discount" was allowed; in the Williams order, Rellah described the car as "Demo," meaning demonstrator; and in the Brown sale, the word "used" appeared as "U Sed." In the other transactions, a used car order form was given to the purchaser. When interrogated about this, the salesmen and, in some instances, Morese, the sales manager, assured the buyer that the car was new but, because the defendant Halsey Packard, Inc., was an authorized Packard dealer, they could use only the used car form in connection with the sale of a car of another make. Mrs. Klaymeier, for example, testified as follows:
"I told Mr. Moore I wanted the car canceled because it was a used car. And he told me they used this blank because they are an authorized Packard dealer and in order to sell other type cars besides Packards they used this used car order form, but that it was a new car."
There was testimony that salesmen adopted a selling technique, referred to as "switch-sell or bait," which diverted *11 the interest of a prospective purchaser from a new automobile on the floor of the salesroom to one which appeared new and was represented to be new but which was in fact a used car.
Both Ernest and James Graziani participated in the adjustment of claims of some of the 13 above-named buyers; and, in the Williams case, Ernest soon recognized that this car had been involved in an accident. This was one of the cars which at the time of sale had been represented as a new car by the salesman Rellah. However, none of the salesmen was ever discharged.
The defendants on their case denied a conspiracy. They offered evidence that Halsey Packard, Inc. was an authorized Packard automobile dealer and sold other new and used cars; that during the period stated in the indictment it sold 4,332 automobiles, of which 55 were new Packards, 488 new cars of various other makes and 3,790 used cars. Defendant Halsey Automobile Co. sold new and used cars of various makes and, in the period of about six months from October 1956 to March 14, 1957, sold a total of 494 cars, of which 33 were new and 461 were used cars.
Defendants insisted that the advertisements were not misleading or untruthful; that they had new Packard cars for sale and that whenever they advertised new cars other than Packards for sale, they had such cars available for sale.
Ernest Graziani, as noted, knew about the steam cleaning of cars and the turning back of the speedometers by his brother James. James, in his testimony, explained that the company gave a 90-day or 4,000-mile guaranty, and it was for that reason that he turned the speedometers to zero.
All of the salesmen, with the exception of defendant Aquilino, who did not testify, denied a conspiracy and the fraudulent acts attributed to them. It will be recalled, however, that it had been stipulated that each of the cars involved in the 13 sales referred to were used cars and that the particular salesman who made the sale knew at the time the sale was made that the car was used.
*12 At the close of the State's case the defendants moved for an acquittal which the court denied. Upon the conclusion of the defendants' case these motions were renewed and again denied. Appellants claim that this was erroneous. After the jury verdict of guilty, defendants moved for a new trial which the court also denied.
The following sentences were imposed: Ernest Graziani to serve 12 months in the Essex County Penitentiary; James Graziani, probation for three years and a fine of $1,000; Halsey Packard, Inc., and Halsey Automobile Co., each to pay a fine of $1,000; Joseph Morese, probation for three years and a fine of $1,000; Henry Rellah, probation for three years and a fine of $750; Michael Moore, probation for three years and a fine of $500; Dominick Canace, probation for three years and a fine of $300; and Angelo Aquilino, sentence suspended.
Three separate briefs have been filed on behalf of the defendants. The principal contention is that the court erred in denying their motions for acquittal because the State failed to present any direct evidence of a conspiracy and that the circumstantial evidence adduced did not exclude every reasonable hypothesis except that of guilt.
Defendants argue that the State's evidence may have warranted the inference that certain of the salesmen may have been guilty of a substantive criminal offense, namely, violation of the statute for obtaining money by false pretenses, N.J.S. 2A:111-1, but that the State failed to prove the offense charged in the indictment  conspiracy, contrary to N.J.S. 2A:98-1.
On behalf of Ernest Graziani and James Graziani, it is contended that the State offered no evidence from which it could reasonably be inferred that they had any knowledge of the existence of a conspiracy and that even knowledge that some of their salesmen were misrepresenting cars would be insufficient to constitute participation in the conspiracy charged in the indictment. On behalf of the corporations, *13 it is argued that in the absence of knowledge by its officer or agent, they could not be found guilty of the offense.
Defendants emphasize that the circumstantial evidence is more consistent with legality than with any taint of illegality because the State presented proof of only 13 fraudulent sales out of a total in excess of 4,300 sales of cars.
The issue for the trial court and for us is not whether the circumstantial evidence excluded every reasonable hypothesis except that of guilt. State v. Bulna, 46 N.J. Super. 313, 317 (App. Div. 1957), affirmed 27 N.J. 93 (1958). The issue to be decided is instead whether the evidence before the trial court, viewed in its entirety, and giving the State the benefit of all legitimate inferences therefrom, was such that the jury could properly find, beyond a reasonable doubt, that the defendants had corruptly agreed to obtain money by false pretenses from purchasers and prospective purchasers of motor vehicles. This is the accepted standard by which to test the propriety of the trial court's ruling on defendants' motions. State v. Goodman, 9 N.J. 569, 581 (1952); State v. Dancyger, 29 N.J. 76, 84 (1959); State v. Hall, 55 N.J. Super. 441, 447 (App. Div. 1959).
It is well known that a conspiracy is rarely capable of proof through direct evidence. The unlawful agreement is most frequently established by inferences drawn from proof of overt acts done in pursuance of it, State v. Greenberg, 105 N.J.L. 383, 385 (E. & A. 1928), and the circumstantial evidence is often "more certain, satisfying and persuasive than direct evidence." State v. Goodman, supra, 9 N.J., at page 581; State v. Carbone, 10 N.J. 329, 339 (1952); State v. Corby, 28 N.J. 106, 119 (1958); State v. O'Connor, 134 N.J.L. 536, 539 (Sup. Ct. 1946); 3 Underhill, Criminal Evidence (5th ed. 1957), § 859, p. 1924. The probative value of circumstantial evidence is determined by the rules of ordinary reasoning such as govern mankind in the ordinary affairs of life. While certain actions of each of the defendants, when separated from the main circumstances and the rest of the case, may appear innocent, that is not significant *14 and undoubtedly appears in every case of criminal conspiracy.
"Conspiracies are concocted secretly and are proved with difficulty. Ordinarily the prosecution must rely on circumstances and inferences. But as Wharton put it:
`* * * This evidence may be such as shows that the parties acted together or in concert, in a manner, under the circumstances, warranting the belief that their acts were the result of previous understanding and agreement between them. A series of acts constituting one systematic scheme and having a natural connection is admissible.
Circumstances attending a series of criminal acts may satisfy the ordinary mind that they result from concerted and associated action, although if each circumstance was considered separately, it might not show confederation.' 1 Wharton, Criminal Evidence, (12th ed. 1955), § 180, at p. 354; State v. Goodman, 9 N.J. 569, 581 (1952)."
State v. Yedwab, 43 N.J. Super. 367, 378-379 (App. Div.), certification denied 23 N.J. 550 (1957).
The evidence in this case adequately sustains the allegations in the indictment. We agree entirely with the trial judge's denial of the motion for acquittal and the submission of the case to the jury. There was an abundance of evidence from which the jury could draw the reasonable inference that a corrupt agreement had been entered into among the defendants. The extensive advertisements under the direction of Ernest Graziani on behalf of the corporations of which he was the sole owner were intended to and did attract prospective purchasers of automobiles to the premises. The phraseology in the bold type in the press and the announcements over radio and television repeating the words "leftover cars" were intended to convey the idea of new, as distinguished from used, automobiles, and the repeated direction that dealings be conducted with a reliable new car dealer was lure to the salesrooms of the defendants. The reconditioning and rehabilitation of the used automobiles by James Graziani, including the turning back of the speedometers to zero and steam cleaning of the automobiles, were quite assuredly designed to give the prospective purchaser the impression that the automobiles were new. The admitted *15 misrepresentation by salesmen to prospective purchasers that the automobiles were new, and the pretext for the use of used-car order forms, constitute separate links in the chain, beginning with the advertisement and terminating with the sale. From the evidence in this case, the jury could reasonably and legitimately find beyond a reasonable doubt, as they did find, a corrupt scheme or agreement among the parties. State v. Vojacek, 49 N.J. Super. 429 (App. Div. 1958).
That Ernest Graziani's proved acts in furtherance of the conspiracy extended only to the direction of advertisements, which, because of the actual availability of new cars, were truthful standing alone, does not compel a finding that he was not a participant in the conspiracy. The overt acts in execution of the conspiracy "need not be enacted by all or any specified number of the conspirators. One will suffice." State v. Western Union Telegraph Co., 13 N.J. Super. 172, 205 (Cty. Ct. 1951), affirmed 12 N.J. 468 (1953). The unlawful agreement becomes an indictable offense when "one of the parties to such agreement takes a step in furtherance of the execution of it." State v. Hemmendinger, 100 N.J.L. 234, 237 (Sup. Ct. 1924), affirmed 101 N.J.L. 417 (E. & A. 1925). See also N.J.S. 2A:98-2; State v. Ellenstein, 121 N.J.L. 304, 315 (Sup. Ct. 1938).
The defendants strenuously argue that proof by the State of only 13 fraudulent sales out of sales of more than 4,000 automobiles by the defendants could hardly be called a pattern of fraudulent conduct. The fact that the State charged and proved only 13 instances wherein purchasers bought used cars in the belief that they were buying new ones because of the false representations of the salesmen does not necessarily indicate that the total number of fraudulent sales was not in excess of the 13 proved. In our judgment, sufficient evidence of the corrupt agreement was adduced by the proof of 13 fraudulent sales. The argument of the defendants could appropriately be, and probably was, made before the jury as an element in support of their claim of *16 innocence, but this contention would not and did not warrant the removal of the case from the consideration of the jury.
Defendant Ernest Graziani argues that the advertisements were truthful and that there were new Packard cars and other new automobiles always available for sale during the advertising campaign. Since the newspapers refused to accept "new car" advertisements before being satisfied that the dealer actually had such cars available, this point was probably true. But the truthfulness of the advertisements again does not negative the existence of an unlawful agreement. The overt act which is performed need not be criminal. See, e.g., United States v. Rabinowich, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211 (1915); State v. Aircraft Supplies, Inc., 45 N.J. Super. 110, 115 (Cty. Ct. 1957). The jury might well have concluded that the defendants agreed to divert the attention of prospective purchasers from the new automobiles to used ones which appeared new. The defrauding of the public came not from the advertisements themselves but from the employment of the technique referred to as the "switch-sell" or "bait," and there was nothing in the case to justify a conclusion that, as a matter of law, there was no agreement to defraud the public by use of these techniques combined with the advertisements. The evidence, as already reviewed, clearly pointed in the opposite direction. State v. Vojacek, supra, 49 N.J. Super., at page 438.
The defendants also urge that the verdict of the jury was against the clear weight of the evidence and was the product of bias, passion, prejudice, mistake or ignorance. In the absence of a clear and convincing showing that the verdict was the result of such influence, a jury verdict will not be set aside. Here no such showing has been made. From our review of the entire record, we conclude that the verdict should not be disturbed and that the ruling of the trial judge in denying the motion for a new trial was proper.
The contention on behalf of Halsey Packard, Inc. and Halsey Automobile Co. that they were entitled to a *17 judgment of acquittal because of absence of proof of knowledge or guilty intent of the corporate officers is palpably without merit. The corporations here are close corporations, and the defendant Ernest Graziani is the sole owner of all the stock of both corporations. The knowledge of the activities of his employees and associates, which the jury could have inferred he possessed, is in turn imputable to the corporation. The guilty intent of corporate officers may be imputed to a corporation to prove the corporation's guilt. New York Central & H.R.R. Co. v. United States, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613 (1909); Mininsohn v. United States, 101 F.2d 477, 478 (3 Cir. 1939); State v. Western Union Telegraph Co., supra, 13 N.J. Super., at page 221; Joseph L. Sigretto & Sons, Inc. v. State, 127 N.J.L. 578 (Sup. Ct. 1942).
The second major contention urged in behalf of the defendants concerns the trial court's refusal to make certain charges to the jury as requested. Ernest and James Graziani requested the following instruction:
"1. The defendants James Graziani and Ernest Graziani are officers of the defendant corporation. An officer of a corporation is not criminally liable for the acts of the corporation, performed through its agents or employees, unless such acts done by his authority or permission or with his knowledge and acquiescence and in the execution of a criminal purpose on his part. State v. Parker, 112 Conn. 39, 151 A. 325 (Sup. Ct. [Err.] 1930). Therefore, unless you are satisfied beyond a reasonable doubt that the defendants had knowledge of the transactions here involved and that they actively participated or gave their passive acquiescence therein, with a criminal purpose, then Ernest and James Graziani are not criminally responsible for such transactions an (sic) you must return a verdict of not guilty in their favor."
The substance of the first part of this request was that, except in certain circumstances, the Grazianis, as officers of the corporation, could not be held guilty for the acts of the corporation performed through other agents or employees. State v. Pincus, 41 N.J. Super. 454, 458 (App. Div. 1956). Although, as the State properly observes, such a charge was *18 at variance with the evidence indicating that the operation ran from the management down and not from the sales force up, the trial judge did in fact offer to charge as far as the word "part" preceding the citation. Since counsel did not respond to this offer, error may not be assigned as to this portion.
As to the balance of the request, the trial judge refused so to charge because the language seemed to require proof that the two Grazianis had knowledge of the particular transactions of the salesmen. The court was clearly correct that one conspirator need not have knowledge of, approve, or participate in every specific act of another conspirator in furtherance of the conspiracy.
Defendants Morese, Canace and Aquilino requested the court to instruct that it must be proved beyond a reasonable doubt that each accused associated with the principals "in the sense that he had a stake in the success of the venture." However, it was not disputed at the trial that each of the defendants had an interest in the increased volume of sales by the defendant corporations. There was therefore no evidence before the jury as to which the quoted phrase would have been meaningful. It is well to observe that we have found the court's charge to be lucid and fair.
Defendants' third contention is that the trial court erred in denying them the opportunity to prove misconduct on the part of the grand jury in returning the indictment. Prior to the trial below, the defendants in this case joined with others indicted for conspiracy by the same grand jury in a "Joint Petition to Dismiss and Quash Indictments." The first "grievance" alleged in the petition was that the grand jury was guilty of misconduct
"* * * for having found and returned the within indictments indifferently and openly without any evidence whatever having been received or heard by them to support the charges, and your petitioners herein allege that there was not, in fact, any evidence of any nature or kind before the said grand jury * * *. Such information as here alleged, has been furnished to your petitioners who, while they have no personal knowledge of the same at this *19 time, nevertheless, in their verification, herein charge and allege this occurrence upon information and belief, believing the same to be true, and they hereby request the opportunity to bring the proofs before this Honorable Court, and request the Writ of Subpoena of this court to issue for the purpose aforesaid." (Emphasis supplied)
The petition was supported by the joint affidavit of Ernest Graziani and the president of another indicted corporation charged with a like offense in the sale of automobiles to the public. Their affidavit recited that "as to those matters [in the petition] alleged upon information and belief, we believe them to be true."
On the basis of the petition and affidavit, the trial judge issued an order to the Prosecutor of Essex County to show cause why a day should not be fixed for the taking of testimony and for the introduction of such other proofs and evidence as might be submitted by the petitioners to substantiate their challenges.
The State's answer to the petition, submitted by the Prosecutor and Assistant Prosecutor, stated that "The Grand Jury voted the indictments in the above entitled cases only after having heard and considered the sworn oral testimony of complaining witnesses concerning each and every charge before it, and in addition thereto having examined and considered real evidence in support of the charges laid in the indictment." Attached thereto was the affidavit of the grand jury foreman, stating unequivocally that "real and testimonial evidence was presented to, and considered by, the said Grand Jury," and that it had heard witnesses on each of the indictments handed down.
On the return date of the order to show cause, the trial judge inquired of defendants' counsel as to whose testimony they proposed to take, and the following colloquy took place:
"Mr. Herman Kapp: Well, we propose to take the testimony of the Prosecutor; we propose to take the testimony of the clerk of the grand jury; and we propose to take the testimony of such other custodians of records, minutes, and other indicia of proof, documentary and otherwise, as would satisfy your Honor, as well as members of the grand jury who were present at the time.
*20 The Court: Is it your thought to ask not only what witnesses appeared but also what they testified to?
Mr. Herman Kapp: I cannot go into the details of the testimony, your Honor. That is not my right.
The Court: You are limited to the names of the witnesses?

* * * * * * * *
The Court: You need not answer this but it will have a bearing on my disposition of the case. Are you prepared to say what information, whether it is by hearsay, you have as to the appearance of witnesses and who gave it to you?
Mr. Herman Kapp: I don't think I should be asked to divulge a confidence at this time if it was given to me in confidence. I merely make a tender of what proof we want to put in to establish our challenge and substantiate it."
Briefly stated, the defendants' complaint was that they had heard hearsay statements that no witnesses had been called before the grand jury; that they had no way to substantiate the fact because the record of the witnesses who appeared was "under lock and key"; that they had heard hearsay that there was no such record; that the court should examine the record, if it existed; that their suspicions were aroused because the grand jury found the conspiracy indictments only 14 days after having been convened; that the grand jury clerk knew "nothing about this case having been presented and has no minutes and did not even get the vote." Counsels' argument to the trial judge was more that there were no witnesses before the grand jury than that there may have been some witnesses but not enough to implicate all those who were indicted.
Three days later the trial judge rendered his decision on the defendants' application to take testimony. Relying on State v. Dayton, 23 N.J.L. 49 (Sup. Ct. 1850); State v. Borg, 8 N.J. Misc. 349, 150 A. 189 (Sup. Ct. 1930); In re Kelsey, 127 N.J.L. 568, 573 (Sup. Ct. 1942); State v. Biehl, 135 N.J.L. 268, 271 (Sup. Ct. 1947); and State v. Grundy, 136 N.J.L. 96, 99 (Sup. Ct. 1947), he said:
"Before a court orders the taking of such testimony as is sought here, it seems to me the cases hold that there should be a strong prima facie showing of misconduct or that the Grand Jury heard no witness and received no testimony * * *. Assuming without *21 admitting that an affidavit upon information and belief is proper in a matter such as this, certainly the source of the information and the grounds of belief should have been stated, and the nature of the information should have been given in such detail that the court could determine whether, if proven, it would constitute such misconduct as would cause the court to nullify the indictment."
Defendants' motion for leave to appeal from this interlocutory order was denied by the Appellate Division in an oral ruling on October 21, 1957. The case proceeded to trial, the defendants have been convicted, and the order is now before us for review.
R.R. 3:3-7 ordains that the "requirements as to secrecy of proceedings of the grand jury shall remain as heretofore." The rule is to be read in conjunction with R.R. 3:3-5 which confers upon the assignment judge the power to order the record of the vote of each juror, kept by the clerk of the grand jury, to be made public. No procedure is suggested by the rules, however, as to the manner in which defendants may obtain information concerning what witnesses have testified before the grand jury, whether there was any testimony taken, or whether the testimony, if taken, was sufficient to substantiate an indictment. In view of the fact that witnesses before the grand jury are not bound by the oath of secrecy taken by the jurors themselves, the tactic most frequently employed by counsel, although not pursued in this case, is to inquire of the witnesses at the trial whether they appeared before the grand jury and whether their testimony at the trial is contradictory thereof. See Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), rehearing denied 351 U.S. 904, 76 S.Ct. 692, 100 L.Ed. 1440 (1956); State v. Bovino, 89 N.J.L. 586, 588 (E. & A. 1916); State v. Silverman, 100 N.J.L. 249, 252-254 (Sup. Ct. 1924); State v. Goldman, 14 N.J. Misc. 463, 465, 185 A. 505 (Sup. Ct. 1936); 8 Wigmore, Evidence (3d ed. 1940), § 2363, p. 726. Cf. State v. Manney, 24 N.J. 571, 583 (1957).
As stated, that method of proving the alleged lack of evidence before the grand jury was not employed in the *22 present case. This is not said by way of criticism, for here the attack on the indictment was pressed prior to the trial thereon, and a defendant with substantial grounds for having an indictment dismissed should not be compelled to go to trial to prove the insufficiency.
Yet, inasmuch as no showing was made at the trial to confirm the allegations that the grand jury acted on insufficient evidence, the narrow question before us is not whether there was misconduct in fact on the part of that body, but whether the pretrial showing by the defendants and the other indictees was of such caliber as to require the taking of testimony to prove the allegations contained in the "Joint Petition." As to this, we are satisfied that the trial judge, in the absence of facts to rebut the presumption that the indictment was returned on sufficient evidence, properly refused to permit the defendants to explore the proceedings before the grand jury. The vague hearsay affidavit of the defendants attached to the "Joint Petition" was based on "information and belief" only, and, in such circumstances, the remote possibility that facts might be adduced to substantiate the challenge did not warrant any further interruption of the normal course of criminal proceedings. See Kastel v. United States, 23 F.2d 156, 158 (2 Cir. 1927), certiorari denied 277 U.S. 604, 48 S.Ct. 600, 72 L.Ed. 1010 (1928); Cox v. Vaught, 52 F.2d 562 (10 Cir. 1931); Laska v. United States, 82 F.2d 672, 678-79 (10 Cir. 1936), certiorari denied 298 U.S. 689, 56 S.Ct. 957, 80 L.Ed. 1407 (1936); 42 C.J.S. Indictments and Informations § 24(c)(2), p. 869; 27 Am. Jur., Indictments and Informations, § 164, p. 715; id., § 142, p. 699.
Authority to the contrary in this jurisdiction is said to have been established by the decisions in State v. Jones, 115 N.J.L. 257 (E. & A. 1935); State v. Donovan, 129 N.J.L. 478 (Sup. Ct. 1943); State v. Donovan, 130 N.J.L. 42 (Sup. Ct. 1943); and State v. Manney, supra, 24 N.J., at page 577 (1957). These cases are clearly distinguishable. In State v. Jones, the defendant challenged *23 the array, charging the systematic exclusion from the grand jury of those of his color. The trial court's refusal to make any inquiry into the allegation or to receive any evidence in support thereof was reversed. 115 N.J.L., at page 258. The case was clearly correct, for the composition and qualifications of the grand jury, unlike its internal proceedings, are subject to judicial scrutiny whenever challenged.
In the State v. Donovan cases, the charge was that certain presentments returned against former public officials were politically inspired and were a progressive step in a planned campaign of political assassination. 129 N.J.L. 478. It was held that the indictees were entitled to ask not the details of the evidence, but simply whether there was evidence before the grand jury to justify the presentments. Id., 129 N.J.L., at page 483. In the instant case, however, there is no basis at all in the record for even a suspicion that the grand jury was in any way prejudiced against the defendants. Nor were there present in the Jones and Donovan cases an unequivocal affidavit by the grand jury foreman and a representation by the assistant prosecutor in open court, both to the effect that the indictments were returned on the basis of evidence received and considered. And State v. Manney, far from sustaining the defendants' contention, is an instance where the Supreme Court reversed the action of the trial court in quashing an indictment on the basis of affidavits alone, which charged that unauthorized persons were present in the grand jury room. The Court expressly warned against subscribing to "`delays and defeats in the prosecution of crime' unless some prejudice is shown constituting a trespass upon fundamental justice." 24 N.J., at page 583. Fundamental justice does not demand that defendants be afforded an opportunity to explore alleged irregularities in the internal operations of the grand jury until there is a clear preliminary showing of possible misconduct  based on something more than "information and belief."
*24 The "second grievance" in the "Joint Petition" complained of a letter sent to prospective witnesses by the prosecutor in which it was suggested that if the defendants approached them for a statement, the statement, if any, should be given to defendants at the prosecutor's office. Although there was no instruction in the letter that the witnesses not give a statement to defendants privately, defendants complained to the trial judge (and again to the Appellate Division on the motion for leave to appeal) that the letter resulted in a refusal of the witnesses to give them any statement, thereby destroying their right to interview material witnesses in advance of trial and making a fair trial impossible. The trial judge did not pass on whether the letter was justified, but he ruled that whatever prejudice it occasioned could be removed by a second letter. Accordingly, he ordered the prosecutor to mail another letter, prepared with the assistance of the attorneys for defendants, to make it clear that the witnesses were to feel free to give defendants whatever statements they wished. Although the attorneys refused to participate in the drafting of the second letter lest they prejudice the defendants' position, it was mailed by the prosecutor sufficiently prior to the trial so that defendants could not have been prejudiced by the first letter. Defendants not having been prevented from preparing their case, the incident does not justify a reversal.
The judgments of conviction are affirmed.
HANEMAN, J.A.D. (dissenting).
The majority has determined that the evidence at the close of the State's case, taken together with the legitimate inferences which may be drawn therefrom, was such that a jury could properly find, beyond a reasonable doubt, that defendants had corruptly agreed to obtain money by false pretenses. Thus, they conclude, it was proper, at that stage in the proceedings, that the trial court deny defendants' motions for acquittal. The standard which they employ for testing the evidence in a circumstantial evidence case follows the language of the *25 rule recently restated by the Supreme Court in State v. Dancyger, 29 N.J. 76 (1959). That statement of the standard is an amalgamation of two seemingly different tests which have been employed over a period of years. The two cases cited in Dancyger in support of the rule there laid down, State v. Rogers, 19 N.J. 218 (1955) and State v. Goodman, 9 N.J. 569 (1952), are not cited as direct authority for the statement of the rule. It is reasonable to assume, therefore, that the "accepted standard" employed by the majority is that against which the evidence in the present case must be measured. And there is no doubt that it represents a lesser burden to the State than the forceful language, e.g., of State v. Rogers, 19 N.J., at page 232. I do not disagree with that standard and accept it as the rule; however, when I test the proofs of this case by that rule I arrive at the opposite conclusion from that reached by the majority and, thus, to the ultimate conclusion that it was error to deny the motions for acquittal at the close of the State's case.
The principal support for the indictment is the unlawful agreement. Without proof of its existence none can be convicted of the crime of conspiracy; with proof of its existence and some overt act in furtherance of that agreement, none involved can escape entanglement in the conspiratorial net. But, in any case, the conspiratorial pudding will not set unless the proofs at the close of the State's case are such as will warrant a finding by the jury, beyond a reasonable doubt, that there existed among the defendants an agreement to accomplish the things with which they stand charged and that there was an overt act in furtherance of some purpose embraced by their agreement.
Appellate review of the propriety of denying a motion for a judgment of acquittal is confined to a review of the evidence as it affected the defendant at the time the trial court was called upon to rule. Defects in the State's proofs which were cured on defendant's case cannot be considered on the review of the ruling by the trial court. State v. Yedwab, *26 43 N.J. Super. 367 (App. Div. 1957); certification denied 23 N.J. 550 (1957). The proofs which satisfy the rule may be circumstantial. It is the trial court's duty to determine whether the evidence is competent to justify certain inferences but it is not the trial court's function to decide which of the various inferences should be drawn. United States v. Valenti, 134 F.2d 362 (2 Cir. 1943), certification denied 319 U.S. 761, 63 S.Ct. 1317, 87 L.Ed. 1712 (1943).
Twenty-one persons were indicted by the Essex County grand jury for conspiracy to obtain money by false pretenses. N.J.S. 2A:98-1 and 2A:98-2. The trial of ten was severed on the State's motion. The remaining 11 were tried together under the indictment. The trial court directed a judgment of acquittal in favor of one of the 11. The ten remaining defendants were convicted and appeal from the judgment of conviction which was entered upon the verdict of a jury and from the sentence imposed upon each of them. Defendants moved for a judgment of acquittal at the end of the State's case.
I dissent from the opinion of my colleagues on the propriety of the ruling on the motion for acquittal at the close of the State's case, which is but one of five grounds advanced for reversal and argued on this appeal. And so, I turn to a detailed summary of the proofs adduced on the State's case.

STATE'S CONTENTIONS.
Defendant Halsey-Packard, Inc. was a franchised dealer for Packard automobiles. The corporate business was conducted from a large building situate at 571 Central Avenue, Newark.
In his opening to the jury, counsel for the Grazianis and the corporate defendants, stated that Ernest Graziani is the brains of the business; he is the owner of the business; his brother James is the secretary of the corporation and owns one share of stock. He is an employee of those corporations. Defendant Morese was sales manager from September 1955 *27 to January 1957. Defendant Rellah then became sales manager. All other defendants were salesmen employed by Halsey-Packard, Inc.
Some of the automobiles which Halsey-Packard, Inc. had for sale were so-called "leftovers." Counsel stipulated "that the word leftover as used in the advertisements of Halsey-Packard, Inc. referred to new cars." The public has apparently accepted this trade meaning of the term "leftover." The term identifies an unused automobile of the manufacturer's model year immediately preceding the current model year, e.g., a "leftover" 1958 model car is one which is unused and on hand when the 1959 models are announced.
The theory of the State's case is that the defendants conspired to cheat and defraud the general public and to obtain money from them under false pretenses, through the sale of used automobiles as "leftovers." It is not contended that this conspiracy was directed at any particular individual prospective purchaser but rather at those individuals as members of the general public.
The view of the State is that the alleged conspiracy is constituted by joining together three links in the business activity of Halsey-Packard, Inc. When the links are bent together the result is the conspiracy alleged. The components are these:
1. Advertising: On or about September 1, 1955 Halsey-Packard, Inc., through its president, Ernest Graziani, undertook an advertising campaign via the mass communication media, i.e., newspapers, radio and television. The campaign spanned a period of 18 1/2 months, ending March 14, 1957. Its alleged object was to "educate" the public to believe that Halsey-Packard, Inc., a reliable new car dealer, had available for sale "leftover" automobiles of divers manufacture at low prices. The underlying purpose ascribed by the State to this campaign was to build to prestige of Halsey-Packard, Inc., especially the "reliable new car dealer" facet of that prestige, and thus attract a large volume of prospective customers, so imbued by the advertisements that *28 they would accept, as new and unused, vehicles which were, in fact, used. Parenthetically, it is admitted that whenever, during this advertising program, a "leftover" vehicle was advertised for sale, Halsey-Packard, Inc., had in its possession and for sale a vehicle of the make, model and year advertised and, thus, that the advertisements were not, ipso facto, false.
2. Servicing of automobiles: The second link in the State's theory of the case is the processing and conditioning of used vehicles so as to make them appear as new. The alleged procedures involved replacing the odometers in used vehicles so that they read at zero miles, and the steam cleaning of the engines of such vehicles so as to give the impression that the vehicles were new and unused. These processes, it is alleged, were accomplished at the direction and under the supervision of James Graziani.
3. Switch sales: The alleged transaction which completes the chain is the "switch-sell or bait" technique. It is alleged that through this selling technique the salesmen for Halsey-Packard, Inc. would divert customers from their consideration of a legitimate new automobile to one which appeared new but was, in fact, used, and would represent such vehicles as new and unused. The implication which the State draws from this selling procedure is that it was conducted at or under the direction of Halsey-Packard, Inc. through its agents and effectuated the result which all had planned.
The State asserts that these three elements, taken together, constitute a conspiracy to defraud the public.

PROOFS.
The State argues that the existence of a conspiratorial agreement was proved by circumstantial evidence which fell into three categories, i.e., (1) advertising; (2) servicing of used automobiles; (3) "switch" sales. The testimony will be examined in that order, having in mind that the inference of guilt must arise from the entire proof and not *29 simply a segregated portion thereof. State v. Dancyger, supra; State v. Rogers, supra.
Advertising: Over a period of 18 1/2 months Halsey-Packard, Inc. spent in excess of $300,000 on advertising. Of the advertising copy employed (newspapers, radio and television) the prosecution produced 28 newspaper advertisements and nine television scripts. Most of that advertising copy pointed out that Halsey-Packard, Inc. was a new car dealer. All such as was introduced in evidence stressed that the corporation had "leftover" vehicles for sale. The copy was prepared for Halsey-Packard, Inc. by members of a firm specializing in that work. The content of the copy was arrived at through conferences between the advertising firm and Ernest Graziani. The witness who was responsible for the Halsey-Packard, Inc. advertising account testified that he knew that the firm was an authorized dealer in Packard automobiles; that he knew the firm had both new and used automobiles for sale; that when particular "leftovers" were advertised for sale Halsey-Packard, Inc. in fact had "leftovers" of the makes and models advertised. Halsey-Packard, Inc. also advertised Packard automobiles (its franchized new car line) for sale during this same period of time.
It is admitted that the advertising statements were truthful  that in each instance Halsey-Packard, Inc. had a new car available as advertised. I note again, parenthetically, that the format and content of at least one newspaper advertisement was substantially the same as that inserted by other automobile sales companies. The advertisement referred to is one which appeared in The Newark Star-Ledger on January 12, 1956 and is one in which Halsey-Packard, Inc. did not use the new car dealer phrase. This advertisement is similar in format and content to that of another automobile sales company advertisement which appeared on the same page of the newspaper.
The State admitted that the 28 copies were the only ones of such a tenor which it could discover, and that there were *30 other advertisements during the same period of time where the phrases "new car" and "new car dealer" were not stressed. In five of the 18 newspaper advertisements reproduced in the appendix the "new car dealer" phrase is not used. Concerning these advertisements, the prosecutor stated:
"We had some discussion earlier about whether there were other ads. It was also my understanding that there were other ads. It was also my understanding that there were other advertisements other than leftovers. They alternated Halsey Packard sales with a leftover sale during the same date. The advertisements which have been marked in evidence are substantially all the leftover ads that I have been able to pull out from the newspapers during that eighteen-month period." (Emphasis supplied)
The only newspaper advertisements produced by the State were those which appeared in The Newark Star-Ledger, although it appears from the testimony of the advertising agency representative that the advertising campaign included other newspapers. Quite patently, the expenditure of $300,000 must have been concerned with a far greater number of inserts and scripts than were offered as exhibits. Upon the proof of the foregoing, it could not be concluded that the advertising campaign was part of a conspiracy to mislead the public into the belief that Halsey-Packard, Inc. was solely a dealer in new cars and had available only new cars for sale. Not only was it admitted that the new cars were available as advertised, but there is absent any proof that new cars were not actually sold.
Remember that the State's contention is that the advertising campaign resulted in misleading the public into the belief that Halsey-Packard, Inc. was a new car dealer selling only new cars. To prove that the public had been so misled, it produced 13 purchasers of cars. An examination of the testimony of these purchasers on the question of the effect of the advertising is most revealing.
1. Schrauth testified that she had seen a television advertisement  inferentially of new cars, since she requested to be shown a new car. Implicit in her statement to the *31 salesman that she "wasn't interested in used cars [and] didn't want to get stuck" is the admission that she knew that Halsey-Packard, Inc. was engaged in selling both new and used cars.
2. Clippinger did not testify that he had seen or heard any advertisements. He made two inquiries as to whether the car he purchased was a new or second-hand car. Again, it is evident that he did not believe Halsey-Packard, Inc. sold only new cars.
3. Hamming had read an advertisement concerning 1956 Chevrolets.
4. Hughes did not testify that he had heard or seen any advertisements.
5. Jahoda testified that he had seen a television advertisement of 1956 "leftovers." He too made inquiry whether the cars he was examining were new cars.
6. Gargalowitz had seen and heard advertisements of 1956 "leftovers." She was shown both new and used cars. She also inquired whether the car she had selected was a new car. At least when she entered the salesroom she was alerted to the fact that Halsey-Packard, Inc. sold both new and used cars.
7. Ferrigno both saw and heard advertisements of "leftover" cars. He was advised that they had sold the cars advertised but had "several new cars."
8. Frascino had seen an advertisement of different models at different prices. He did not state whether they were used or new cars.
9. Delgado testified that although he had seen an advertisement on television, he "never paid that any mind."
10. Kasmarek did not testify that he had ever seen any advertisement.
11. Klaymeir testified that she and her husband had seen new cars advertised on television. She noted a sign reading "used cars" at the salesroom and was hence alerted before purchase to the fact that Halsey-Packard, Inc. sold both new and used cars.
*32 12. Williams did not testify that he saw any advertisements.
13. Brown saw an advertisement of 1955 "leftovers" on television.
Five of the 13 purchasers, therefore, failed to testify that they had read any advertisements, and a sixth testified that he did not pay any attention to the advertisements. Of the seven who saw some advertising, at least five were alerted to the fact that Halsey-Packard, Inc. sold used cars before consummating a purchase. If the State's theory that the purpose of the advertising campaign was to mislead the public, it failed in six of the recited sales to have any effect whatsoever, and in five additional sales, the purchasers were disabused of any such impression before purchasing.
But the State urges that this advertising campaign must be viewed in the light of the following two "essential" steps.
Servicing used cars: The sole evidence submitted which, it is alleged, related to placing used automobiles in such a condition as to mislead a prospective purchaser into the belief that they were new cars concerned speedometers. The gist of the testimony of Wright, a speedometer expert, not an employee of Halsey-Packard, Inc., was that when he was called to do work for Halsey-Packard, Inc. it was to perform proper repair work on speedometers. Among the services performed by him was the repair of defective odometers. Because of their composition, the defective odometers on which he worked had to be replaced with new units. He testified that he did not reset the odometers in other cars for Halsey-Packard, Inc. It was only when an odometer was damaged and had to be replaced that he installed a new odometer with no mileage reflected thereon.
The effect of a stipulation by counsel for James Graziani was that speedometers on used cars fell into three classes, (1) odometers on used cars which reflected zero when purchased by Halsey-Packard, Inc.; (2) odometers which reflected the true mileage where cars were resold before there was an opportunity to reverse; and (3) other odometers *33 which reflected zero were reversed at the direction of Halsey-Packard, Inc. It does not appear under whose direction or authority odometers were reversed. There is absent any proof that the speedometers in the cars involved in the 13 sales, hereafter adverted to, were reversed.
The proof indicated that in many instances no work had been done on the 13 cars here involved. The evidence disclosed that on the following sales, the following defects were noted by purchasers before purchase: (1) Schrauth  dent in left rear fender, dirty upholstery, the odometer on the first vehicle which she purchased registered 100 miles; (2) Clippinger  scratches on finish, air filter and oil filter dirty, four worn tires, four miles registered on odometer; (3) Hamming  front headlight not functioning, no stoplight, worn spare tire; (4) Hughes  odometer registered .09 miles; (5) Jahoda  odometer registered 154 miles; (6) Gargalowitz  paint chipped, no handle on side vent, inside light not functioning, seat adjustment handle missing; (7) Kasmarek  scratches near door; (8) Klaymeir  dust and scratches; (9) Brown  door handle stuck, odometer registered 60 miles.
There was no proof that the motors had been steam-cleaned. There is testimony in only three instances with regard to the engines. Clippinger testified that the engine looked clean but other apparent conditions of the engine warned him that the vehicle was not new. Dalston, one of the witnesses involved in the Kasmarek sale, and Jahoda testified that the engine of the vehicle purchased looked new.
There was no competent proof that used cars had been generally reconditioned and particularly that the cars concerned in the sales here involved had been reconditioned so as to mislead prospective purchasers. Nor is there proof that the engines had been steam-cleaned.
Sales: It was stipulated that each of the 13 sales was of used cars, known to be such by the salesman who closed the transaction. In considering this testimony it must be remembered that we are not concerned with the substantive *34 crime of obtaining money under false pretenses. Whether the individual salesmen were guilty of that crime is of no moment. A consideration of the sales may be made only to decide whether those sales, in conjunction with the advertising and alleged reconditioning, spell out a conspiracy to defraud or, restated, whether the proof relating to sales, when viewed in the light of the other proof, was such as would give rise to a natural inference that the sales were a result of a conspiratorial agreement and were made in furtherance of the alleged conspiracy.
Of the 13 purchasers, 12 signed used car orders and four received used car guarantees. The purchase orders were in the following general format:
 "USED CAR ORDER
 HALSEY-PACKARD, INC.
 571 Central Ave., Newark, N.J.
 Date ____
Please enter my order for one used car as is
 other is
Make Year
Motor No. License or Title No.
Cash price of car
Accessories
Total cash price
Deposit on order
Used car allowance
Less bal. due on my car
Cash on delivery
Record of car traded in
Total Credit Balance due
Make Year
Motor No. Finance charges
Serial No. Model Amount of Contract
To be paid in Payments of each
No salesman's verbal agreement is binding on the Company; all terms and conditions of this sale are expressed in this agreement; any promises or understandings not herein specified in writing are hereby expressly waived. The above car is in good condition and we do not guarantee. Any adjustments or repairs made from this day will be charged for. We do not guarantee the mileage, or model. It is understood and agreed that the Title of Ownership of car as above described does not pass to me until the final cash payment is made. I certify that I am twenty one years of age or over and *35 that the car I am trading in is free from all incumbrances whatsoever, except as noted above. In the event this order is cancelled, the Dealer reserves the right to retain all deposits sufficient to cover liquidating damages. This order is not binding unless authorized by an officer of the company.
 Buyer's signature
 Address Phone
 Accepted Salesman
 Date delivered (Dealer's signature)."
 (Italics supplied)
The guarantees were in the following general format:

"HALSEY PACKARD, INC.

90 day  4000 mile Guarantee
Make Model Custom line
The used motor vehicle described below is guaranteed by the undersigned dealer under normal use and service for the exclusive benefit of the Purchaser for a period of 90 days or Four Thousand Miles, which ever occurs first, against any necessary mechanical repairs to the extent of fifty (50%) per cent reduction from the regular current list price of materials as said list prices are established by the manufacturer of the vehicle; provided the vehicle is delivered to our place of business during the above stated period.
The obligation of the dealer under the terms of this guarantee is void if the above-described vehicle is not brought in to Halsey Packard, Inc. for lubrication and oil changes at the customer's expense, at the end of each 1000 miles of use during the 4000 mile period. Dealer's guarantee is expressly limited to repairs and replacements made by Halsey Packard, Inc. at its place of business, does not include bills contracted elsewhere, is rendered void if the above motor vehicle is serviced or repaired elsewhere, or has been subject to misuse, negligence, or accident.
No guarantee is made as to Automatic Transmission, Towing Charges, leaks, rattles, motor failure, tires, radio, glass, accessories, model or mileage, electrical equipment, steering gear, thermostats, gasoline gauges or speedometer. Buyer understands that this guarantee is given to him in lieu of any and all other guarantees whether expressed or implied and it constitutes the only obligation on the part of the dealer and no person is authorized to assume any other liability or obligation against the dealer in connection with the sale of this motor vehicle.
 Date of delivery Halsey Packard, Inc.
 By
 I have read the above, accept
 the terms and limitations as
*36
 stated, and acknowledge that
 this guarantee constitutes the
 entire obligation of the dealer.
 I acknowledge receipt of my copy of
 used car order and that all papers
 were filled out before I signed
 them.
 [Customer's signature]"
If defendants employed these forms for the purpose of covering their tracks it was a most ingenious, but, dangerous, method, since the purchasers, in spite of glib explanations, were surely alerted to tread cautiously. Of the 12 purchasers so receiving used car orders, six made inquiry as to the reason for including the word "used" in a "new" car sale.
The State proceeded with proof of the circumstances surrounding 13 purchases. The testimony in connection with these purchases is as follows:
1. Dorothy Schrauth, a secretary employed by the Civil Service Department of Duchess County, New York, saw a television advertisement of Halsey-Packard, Inc. and made inquiry by letter as to the amount of trade-in allowance she could receive for a 1951 Hudson on account of the purchase of an automobile. She received a reply letter from defendant Rellah, which has been destroyed. On or about June 28, 1956 she went to the office of Halsey-Packard, Inc. and met Rellah. She inquired of Rellah whether "the cars were as advertised" and advised him that she "wasn't interested in any used cars and didn't want to get stuck." Rellah told her that the automobiles were as advertised. She asked for and was shown a Ford automobile. Upon inquiry as to whether it was new, Rellah replied "doesn't it look like a new car?" She noted that the speedometer showed 100 miles. Upon being questioned about the mileage, Rellah replied that it was put on in transporting the car from the place of purchase to the showroom. An examination of the car disclosed a dent in the left rear fender which Rellah explained was probably inflicted in moving the vehicle about the showroom. She agreed to purchase the car and took *37 delivery of it on the same day. At the time of purchase she signed a used car purchase order and received a used car guarantee. She made inquiry of Rellah whether the word "used" meant anything in the guarantee and was advised by him that it was "a form that they used for all of their cars." Thereafter the automobile which she had purchased developed generator trouble and would not start. Upon being advised by telephone of this condition, Rellah suggested that she return the car to Halsey-Packard, Inc. and he would give her another one. Upon her return she was shown a Chevrolet. When inquiry was made of Rellah whether it was a new car he failed to answer. She noticed that the upholstery in this automobile was dirty and called Rellah's attention to that fact. He replied that she was too fussy. She accepted delivery of the Chevrolet on July 5, 1956. Later she found that the brakes would not hold and that the front seat was out of line. She returned to Halsey-Packard, Inc. and told Rellah of her complaint. The brakes were repaired and she was referred to another firm to have the seat repaired. This apparently could not be accomplished. At the time of the purchase of the Chevrolet she signed a used car purchase order in the above form. Mrs. Schrauth admitted that she read over the purchase order and the guarantee on the day she purchased the car and that Rellah had at no time represented either of the automobiles to be new cars.
2. Stewart M. Clippinger, an engineer for Sperry Gyroscope Co., testified that he was engaged in the sales and service of precision equipment used in aircraft. He did not testify that he had seen or heard any of the advertisements of Halsey-Packard, Inc. On December 24, 1955 he approached Rellah at Halsey-Packard, Inc. and asked for a "leftover" 1955 Packard automobile. Rellah showed him an automobile, explaining that it was the only Packard left and that it was a new car and special, i.e., that it had been specially ordered for a customer who was killed in an airplane accident before delivery was made. The vehicle was on display on the main *38 floor of Halsey-Packard, Inc., decorated in a Christmas motif. The decorations prevented Clippinger from examining the vehicle in detail, except for the rear deck, which looked "beautiful." He did, however, notice some scratches in the finish on the door. The price was agreed upon and Clippinger signed a purchase order, making a deposit of $10 on account thereof. Nowhere on this order does there appear any legend which would lead to the conclusion that the automobile sold was a used car. On the date of the purchase he was told that the car could not be serviced because it was being used as a Christmas display, but was advised that he should return on December 27 to take delivery. Upon his return on December 27 the vehicle was still decorated and in the same place. While he and Rellah were preparing the necessary papers for the transfer of title, the vehicle was taken to the second floor shop to be serviced. He was told that customers were not permitted in the shop, but after the car was serviced Rellah invited him to go upstairs in order to view his purchase. Clippinger then looked under the engine hood and testified that "the engine was beautifully clean, with two exceptions; the air-cleaner and the oil filter. The dirt on these two elements was something that could not be built up in the four miles shown on the speedometer." He said to Rellah: "What the hell did you sell me, a second-hand car?" Rellah replied: "No, this is a new automobile; and pointed to the paper tags on the engine, and they were burnt to a crisp." Three of the tires on the automobile were worn and the fourth was very much worn. On second inquiry as to whether this was a new car, Rellah replied: "What kind of an outfit do you think you are dealing with? Certainly it's a new car." He explained that old tires were used in the garage to preserve new tires from being scuffed. Rellah had four new tires installed the following day. The certificate of title was delivered on January 4, 1956. It bore the serial number A461549aZ. Clippinger became suspicious that the "A" designated something other than a new car but did not further pursue his suspicions. The day after *39 Clippinger took delivery, i.e., December 28, 1955, he observed an oil spot on the floor of his garage. He drove to a gasoline service station and had the automobile placed on a lift. He then noticed that the front bumper and shock absorber were damaged and that the crackcase was dented. He returned to Halsey-Packard, Inc. and was again reassured by Rellah that it was a new car and that the damage was probably caused by the cartage trailer that brought the car from the factory to Newark.
3. Ite Hamming testified that he read in a newspaper advertisement that Halsey-Packard, Inc. had 1956 Chevrolet cars. It may be noted that he had no difficulty in reading this advertisement, but at the trial, in connection with the two purchase orders and the guarantee which he signed, he suggested a limited capacity to read and write English, and hence a failure to understand the nature and import of those instruments. Although the testimony of Hamming, his wife Jennie and his cousin John Kepperus is somewhat confusing, it leads to the following factual conclusions. On November 24, 1956 they went to the Halsey-Packard, Inc. building and there spoke to Moore. Hamming and his wife had decided that they wanted a new 1956 Chevrolet automobile and they so indicated to Moore. Moore asked  "You don't want to buy a used car?" They replied in the negative. He was shown one or two automobiles and decided upon the purchase of a two-door Chevrolet sedan. The price arrived at was $2,100. On that day he signed a used car order in the form above set forth. Across the face of that purchase order appears the legend "subject to approval of house." On November 28 Hamming returned to Halsey-Packard, Inc. without his wife but accompanied by his cousin, Kupperus. He was advised by Moore, at that time, that Halsey-Packard, Inc. could not sell the car selected for $2,100. Moore sought an additional payment of $300 to complete the sale. Upon Hamming's refusal to pay the additional purchase price, he, Moore and Kupperus repaired to the office of Joseph Morese, the corporation sales manager. Morese advised Hamming *40 that they could not sell a new Bel Air Chevrolet for $2,100 and in that connection took from his file various papers in an effort to substantiate his statement. There was some discussion concerning the payment of a commission to Moore and, after a lengthy argument, Moore's commission was compromised at $20 and the sale price raised to $2,120. Hamming wandered through the various floors of the salesrooms with Kupperus but was unable to discover the car which he said he had purchased on November 24. On November 28 he signed a second used car order, across the face of which Morese wrote  "this is a used car." There is some confusion as to whether this legend was written before or after Hamming had signed the purchase order. Hamming testified that on separate occasions both Moore and Morese explained the appearance of the word "used" by stating that they were Packard dealers, and that all other cars had to be sold as "used cars." Hamming accepted delivery of a car at 10:30 P.M. on November 28, at the curb in front of the Halsey-Packard, Inc. sales office. He admitted that when he entered the car so delivered to him he knew it was different from the one he had seen on November 24. Hamming admitted that he read "used" in the several places where the word appears in the first purchase order, between November 24 and November 28, and that he knew the difference between new and used. He also admitted that no "deal" had been consummated after the discussion in Morese's office on November 28 and until the second purchase order was signed. The arrangement for the purchase was thereafter made upon the compromise with Moore on the amount of the commission to be paid to the latter.
4. Peter J. Hughes testified that he was a payroll supervisor and did payroll and cost accounting. On October 16, 1956 he went to the salesroom of Halsey-Packard, Inc., together with his wife Mary and his two sons, Thomas and Allen. They had been shopping for automobiles and had looked at some 1957 cars. As they were riding down Central Avenue they happened to see the Halsey-Packard, Inc. showroom. *41 He did not testify that he had seen or heard any of the advertisements of Halsey-Packard, Inc. On their arrival at the showroom they were met by Michael Moore, of whom they made inquiry concerning a Ford automobile. Being undecided about color, they looked at a number of cars, both in and out of the presence of Moore. They finally discovered a car of a color satisfactory to them but refused to make any purchase on that evening. During a conversation with Moore they were advised to "take any one you want, they are all brand new." Upon inquiry as to the full price "of this new car" they were advised that it was $2,100. On the next night Hughes returned and, after discussion as to the price, decided on the purchase. While in the process of signing a purchase order upon a "used car order" Mary Hughes made inquiry as to the connotation of the words "used car." She was advised by Moore: "We are working under the Packard Company name and we can't give out any bills of sale because we sell several types of cars. We work under the Packard name. The fifty-sevens are out and we cannot sell * * * we can't give out new bills of sale." Hughes accepted delivery on October 17. While driving home, or shortly after his arrival there, he discovered that there was no front headlight, no tail stoplight or signal light, that there was no jack in the trunk, and the spare tire was worn. He returned the next day to make an additional $100 payment on account of the purchase and the mechanic in attendance fixed the lights and replaced the spare tire. Prior to the purchase, Moore was asked: "How come only nine-tenths of a mile" on the speedometer? He replied that that was the distance the car had been operated to drive it in from the delivery truck. Moore as well explained the dampness on the seats by suggesting that they must have been washed off, since they had probably gotten dusty from standing around. The next day, Hughes discovered that he could not throttle the car speed below 35 miles per hour. He never made any complaint to Halsey-Packard, Inc., the Grazianis or to Moore about his having received a used car *42 which had been represented as a new car, or made any complaint until he noticed a newspaper article concerning an investigation of these defendants. Mary Hughes testified, inter alia, that prior to paying the balance required on account of the purchase, she had a discussion with Rellah concerning an advertisement which appeared that day in the newspaper, advising that Halsey-Packard, Inc. was selling cars for $1,400. She complained that if they had waited a day longer, she and her husband would have saved some money on account of the purchase. Rellah then replied that they would not have wanted the car as advertised, which he showed her. The automobile thus exhibited had no seats in the back and no rug on the floor. In answer to the inquiry  "How would you expect anybody to buy a car like that?" Rellah replied  "We don't expect them to buy a car like that. It's just a gimmick we have to have. We have to have something to drag people in off the streets and if people come in looking for cars at that price, that's what we show them."
5. Harry J. Jahoda, who had attended Long Island University for two years, testified that on or about December 7, 1956 he had been watching television and saw a commercial advertisement for Halsey-Packard, Inc. advising that they had 1956 leftovers at a price of $1,695. On that day he went to the salesroom of Halsey-Packard, Inc. and was waited upon by Joseph Marcelli. In answer to his inquiry whether the cars he was then examining were new, he was advised that they were all new, but that some had been driven in to save shipping charges. He advised Marcelli that he wanted a new car, preferably a Ford station wagon. He was unable to locate a station wagon to suit his desires but located a Ford Fairlane four-door sedan which he later purchased. He admitted that there was no discussion about this particular car but that Marcelli showed him the motor, the interior and the trunk. The motor and the interior looked exceptionally clean and the tire in the trunk looked new. Jahoda signed a used car order. He was advised by Marcelli that *43 it could not be sold as a new car since the speedometer showed that it had been driven 154 miles.
6. Gladys M. Gargalowitz, an office nurse, testified that she had seen the Halsey-Packard, Inc. advertisement of 1956 leftovers on television and had read such advertisements in the Newark Star Ledger. On November 22, 1956 she went to Halsey-Packard, Inc. showroom and was waited on by Angelo Aquilino. She requested that she be shown a new car and apparently saw two new cars and some used cars. She was advised by Aquilino which of said cars were new and which were used. She located a Ford Fairlane which appealed to her and she inquired whether the car was new and was advised by Aquilino that it was a leftover 1956 model. She noticed that the paint on this vehicle was chipped off in a few places; that there was no handle on the side vent window; that the inside overhead light did not function, and the seat adjustment handle was missing. Upon inquiry directed to Aquilino he explained that such defects occurred in the transportation of the vehicle. She made no purchase on that date but returned on two further occasions, November 24 and December 4. On the first occasion she was accompanied by her brother Roland and on the second occasion by her father and brother. On the second visit they were again waited on by Aquilino, who was accompanied by Dominick Canace. Canace advised, upon inquiry, that she would receive a new car guarantee. Aquilino, replying to an inquiry from her father, stated that the vehicle they were considering was a new car. On November 22, although she did not enter into an agreement to purchase, she left a deposit. On November 24 she made a further payment and signed a "used car order." After she and Aquilino had signed the purchase order they repaired to Morese's office, who, in her presence, wrote across the face of the purchase order, "this is not a new car." On making inquiry of Morese as to why he had added this legend, he just "walked away." She admitted that after the papers had been signed she knew that the car she had *44 purchased was not a new car. She received a used car guarantee.
7. Frank Ferrigno, a maintenance mechanic, testified that he saw a Halsey-Packard, Inc. advertisement on television, and a Newark newspaper advertisement concerning leftover cars. On November 6, 1956, in the Halsey-Packard, Inc. showroom, he was waited on by Marcelli. Upon making inquiry for a 1956 leftover car advertised for $1,495, he was told by Marcelli that there were no such cars left, but that they did have "several new cars." He was shown a Chevrolet Bel Air by Marcelli and was told that it was a new car just out of the showroom. Marcelli repeated this statement on several occasions. Upon stating his intention to purchase the vehicle so shown, he was advised that it had been standing on the roof of the building and required servicing and cleaning. Marcelli told him to return in an hour and the car would be ready. He signed a "used car order" and received a used car guarantee, the latter having been mailed to him sometime subsequent to November 6, 1956. He disclaimed any knowledge that either the purchase order or the guarantee designated the car as being "used." He did not realize that he had purchased a used car until he was so advised by Marcelli after he had made complaints concerning various mechanical defects. Ferrigno's wife, Helen, generally corroborated his testimony, but also stated that they had viewed some 20 vehicles, all of which she assumed were new because they had requested to be shown new cars.
8. Andrea Frascino testified that he had seen a Halsey-Packard, Inc. advertisement on television, advertising different models at different prices, but he did not state whether such advertisement referred to new or used cars. On August 15, 1956 he went to the salesroom of Halsey-Packard, Inc. with his brother-in-law and brother and was there waited on by Michael Moore. He told Moore that he wanted a 1955 Chevrolet. He looked at various automobiles for approximately one and a half hours and finally located one *45 which pleased his fancy. He thereupon signed a "used car purchase order" and had the automobile delivered to him. He stated that there was not much discussion with Moore concerning the automobile. He did not testify that any representations were made by Moore as to whether the vehicle he had purchased was new or used. On the same day that he obtained delivery, and shortly after leaving the showroom, he was involved in an accident.
9. Gilbert Delgado, a sergeant in the United States Marine Corps, testified that on December 22, 1956 he was introduced to Joseph Marcelli. Delgado had gone to Halsey-Packard, Inc. in the company of his uncle, who had purchased a Ford from that company and had gone there to accept delivery. He looked at a 1956 Chevrolet with a standard shift. He returned on January 4, 1957 and arranged for the purchase. As he was about to leave the salesroom he saw a 1956 Chevrolet on the first floor and inquired of Marcelli whether it was equipped with an automatic transmission. Marcelli's response was that it was a leftover 1956, so equipped, and that Delgado could take the car he had purchased, equipped with the standard shift, over the weekend, and if it was not satisfactory, arrangements could be made to get the car equipped with "power glide." Delgado returned on January 7, 1957 and then exchanged the Chevrolet equipped with standard transmission for the one equipped with automatic transmission. Upon cross-examination it developed that the purchase order was signed on behalf of Halsey-Packard, Inc. by a Joseph Roselli, who first waited on Delgado on December 22 and sold him the Chevrolet with the standard transmission. He testified that although he saw the Halsey-Packard, Inc. advertisement on television, he "never paid that any mind."
10. Stanley Kasmarek testified that he went to Halsey-Packard, Inc. showroom on December 16, 1956, in the company of his uncle, Richard Dalston, his cousin (an 11 year old boy), and Joseph Craparotta. He was attended by Joseph Marcelli. Dalston advised Marcelli that he wanted *46 a new car for his nephew. He was shown two Oldsmobile automobiles by Marcelli. Craparotta thereupon observed a third vehicle, in which Kasmarek displayed some interest. Dalston assumed this to be a new car because of his original request to be shown new cars. Except for some scratches on the finish near the door handles, the car appeared clean and new. Craparotta and Kasmarek testified that upon making inquiry about the presence of the scratches, Marcelli informed them that it was a new car and that the scratches were showroom scratches. On December 10, 1956 Kasmarek signed a "used car order" and received delivery on December 12 or 13. He did not testify that he had seen any of the Halsey-Packard, Inc. advertisements, but rather that he went to their salesroom upon the recommendation of his uncle.
11. Peggy Klaymeier testified that on November 4, 1956 she and her husband went to the Halsey-Packard, Inc. showroom. They advised Michael Moore that they were interested in purchasing a new Chevrolet which they had seen advertised on television. On their way to the second floor she noticed a sign marked "used cars" and advised Moore that they were interested in a new car. Moore replied that the new cars would be upstairs because they had to be cleaned and polished as a result of being transported. They saw a vehicle which appealed to them. Upon calling Moore's attention to a dent and some scratches, he advised that he would have them repaired before they took delivery. John Klaymeier thereupon signed a "used car order." Upon returning home, Mrs. Klaymeier and her husband noticed the "used car order" and telephoned Moore, seeking to cancel the purchase because it was a used car. She was then advised by Moore that Halsey-Packard, Inc. was an authorized Packard dealer and they were required to use such a form for other makes of automobiles, but assured her that she had purchased a new car. They accepted delivery on November 6. A used car guarantee was subsequently received by mail. The car developed engine trouble *47 and the Klaymeiers did not receive the treatment in connection with this engine trouble to which they conceived they were entitled.
12. Frank Williams, a tailor, testified that on December 26, 1955 he went to the Halsey-Packard, Inc. showroom and was waited on by Henry Rellah. He did not testify that he had seen any advertisements of Halsey-Packard, Inc. He became interested in a Pontiac which he was advised by Rellah was a new car. He signed a purchase order, on the top of which appears the following: "Please enter my order for one Demo. car as follows: Used." He denied that he knew he was purchasing a demonstrator.
13. Lillian Brown, a telephone operator employed by the New Jersey Bell Telephone Company, testified that on or about February 17, 1956 she telephoned Halsey-Packard, Inc. as a result of having seen a television advertisement of 1955 leftover cars, and she spoke to Dominick Canace. She advised him that she wanted a green Plymouth. Shortly thereafter Canace, in the company of one D'Urso, arrived at her residence with an automobile and took Mrs. Brown and her sister for a demonstration ride. As she was about to open the car door she noticed that the door handle stuck. On calling this to the attention of Canace he replied, "It's new, it will work itself out." Upon returning to the house her sister suggested to Canace, "I hope this is a new car and you aren't cheating my sister." Canace replied, "We won't cheat you." She thereupon signed a used car purchase order. She testified that she did not notice the word "used" on the purchase order. The car developed various items of mechanical trouble, which Halsey-Packard, Inc. repaired.
A conspiracy is a separate and distinct crime from the crime that has been planned. State v. Vanderhave, 47 N.J. Super. 483 (App. Div. 1957), affirmed on other grounds, sub nom.; State v. Giardina, 27 N.J. 313 (1958); State v. Oats, 32 N.J. Super. 435 (App. Div. 1954); State v. Chevencek, 127 N.J.L. 476 (Sup. Ct. 1941).
*48 The gist of the offense of conspiracy lies in the forming of the scheme or agreement among the parties. State v. Carbone, 10 N.J. 329, 337 (1952). The agreement is the basic element of the crime. Without proof of the agreement there can be no crime under the statute. Of course, the scheme or agreement need not be proved by direct testimony as to its terms. That it existed may arise by fair implication from the circumstances. State v. Yedwab, supra; State v. Kobylarz, 44 N.J. Super. 250, 253 (App. Div. 1957), certification denied 24 N.J. 548 (1957); State v. Carbone, supra, 10 N.J., at page 341.
Proof of the conspiracy need not be bottomed upon proof of the very words of the actual agreement, but such a charge may be sustained by evidence of other unlawful acts from which a natural inference arises that such unlawful acts were committed in furtherance of the common design of an alleged conspiracy. When the overt acts are of a character which are usually, if not necessarily, done pursuant to a previous scheme or plan, proof of the acts has a tendency to show such pre-existing conspiracy. When so proven they may be considered as evidence of the crime charged. United States v. Crowe, 188 F.2d 209 (7 Cir. 1951); United States v. Morris, 225 F.2d 91 (7 Cir. 1955), certification denied 350 U.S. 901, 76 S.Ct. 179, 100 L.Ed. 792 (1955), certification denied 350 U.S. 943, 76 S.Ct. 300, 100 L.Ed. 823 (1956).
The gist of an indictment for conspiracy lies in the forming of the scheme or agreement among the parties. The offense depends on the unlawful agreement and not the act which follows, and the act is not evidence of the agreement. State v. Carbone, supra, 10 N.J. 329 (1952).
The State did not prove the actual conspiratorial agreement under which the defendants allegedly functioned, but proved facts which it is asserted demonstrated that the defendants acted so together and in concert as to warrant the belief that a conspiracy existed. True, it is normally so difficult to prove a conspiracy out of the mouths of the *49 conspirators as to well nigh approach the impossible. The prosecution must generally, as here, rely upon circumstances and inferences which give rise to such a conclusion. State v. Yedwab, supra.
The defendants are not individually charged with the substantive crime of obtaining money under false pretenses. They are jointly charged with having conspired to obtain money and other things by false pretenses. It is our duty to decide solely whether the State, on its case, has borne the requisite burden of proving the defendants guilty of the crime for which they have been jointly indicted, i.e., conspiracy. We should not let ourselves be confused by proof which might support a conclusion that defendants had individually obtained money by means of false pretenses. N.J.S. 2A:111-1. The confusion of the elements and proofs required to support a conviction of the crime charged with those which may tend to establish a case under an indictment for a substantive offense committed in the course of the alleged crime is one of the inherent dangers which underly conspiracy indictments.
There is a growing and wide-spread habit of prosecutors to indict for conspiracy in lieu of prosecuting for the substantive offense itself. It must be recognized that there are occasions when such a means of combatting crime is not only warranted but necessary. The tendency to extend this crime which "is so vague that it almost defies definition" has been deprecated as a "threat to fairness in our administration of justice."
"But the conspiracy concept is also superimposed upon many concerted crimes having no political motivation. It is not intended to question that the basic conspiracy principle has some place in modern criminal law, because to unite, back of a criminal purpose, the strength, opportunities and resources of many is obviously more dangerous and more difficult to police than the efforts of a lone wrongdoer. It also may be trivialized, as here, where the conspiracy consists of the concert of a loathsome panderer and a prostitute to go from New York to Florida to ply their trade, see [United States v. Krulewitch 2 Cir.], 145 F.2d 76, 156 A.L.R. 337 for details, and it would appear that a simple Mann Act [18 U.S.C.A. § 2421 *50 et seq.] prosecution would vindicate the majesty of federal law. However, even when appropriately invoked, the looseness and pliability of the doctrine present inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case. * * *
Of course, it is for the prosecutors rather than courts to determine when to use a scatter gun to bring down the defendant, but there are procedural advantages from using it which add to the danger of unguarded extension of the concept. * * *
When the trial starts, the accused feels the full impact of the conspiracy strategy. Strictly, the prosecution should first establish prima facie the conspiracy and identify the conspirators, after which evidence of acts and declarations of each in the course of its execution are admissible against all. But the order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon the assumption that conspiracy existed. The naive assumption that prejudicial effects can be overcome by instructions to the jury, cf. Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154, 169, all practicing lawyers know to be unmitigated fiction. See Skidmore v. Baltimore & O.R. Co., 2 Cir., 167 F.2d 54.
The trial of a conspiracy charge doubtless imposes a heavy burden on the prosecution, but it is an especially difficult situation for the defendant. The hazard from loose application of the rules of evidence is aggravated where the Government institutes mass trials. * * *
A co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together. If he is silent, he is taken to admit it and if, as often happens, co-defendants can be prodded into accusing or contradicting each other, they convict each other. There are many practical difficulties in defending against a charge of conspiracy which I will not enumerate."
Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 721, 93 L.Ed. 790 (1948, concurring opinion). See also United States v. Falcone, 109 F.2d 579 (2 Cir. 1940), affirmed 311 U.S. 305, 85 L.Ed. 128 (1940); Dodson v. United States, 215 F.2d 196 (6 Cir. 1954).
There is absent here any direct proof of the existence of an agreement among these defendants to obtain money by *51 means of false pretenses. Thus, at the close of the State's case in the instant matter, the proof of the circumstances surrounding the sale of automobiles, together with all inferences which may be fairly drawn therefrom, must establish a state of affairs from which the jury could logically infer the existence of an agreement or conspiracy to obtain money by false pretenses from the general public. The proofs must first be viewed with this purpose in mind, for unless the conspiracy is established the State's case under this indictment must fail.
The indictment charges that the "false pretenses consisted in that defendants, knowingly, fraudulently, and falsely represented to some customers that certain motor vehicles" were new when in fact those vehicles were used. (Emphasis supplied.) Implicit in the charge is an admission that false pretense was not an element in all sales made by these defendants. That implied admission is of no moment, however, if the jury could logically conclude from the proofs made that an agreement to obtain money by false pretenses from some persons in fact existed.
However, the State urges that the conspiracy may be fairly and logically inferred from a pattern of events established by the 13 sales here involved. Thus, the 13 particular transactions become vitally important for they involve the persons to whom the alleged conspiracy applied. In other words, the alleged conspiracy was to obtain money by false pretenses from some of the customers of Halsey-Packard, Inc. Other sales, assumedly untainted, are not within the scope of the alleged conspiracy. Some are those involved in the 13 transactions. The proof of the existence of the agreement is circumstantial. One of the essential circumstances upon which the State relies to establish the fact of the scheme is a pattern of false pretense in these 13 transactions. Thus, the proofs and logical inferences must be blended to determine whether, on a total view, the conspiracy which the State theorizes was in existence had been established.
*52 The State sought by the 13 sales to prove a concerted action under an alleged conspiracy to obtain money by false pretenses. It must be recognized that the State selected these purchasers out of all the purchases made over an 18 1/2-month period, and that those so selected would, of necessity, be of such a nature as to most strongly prove the State's contention. The State has argued that the conduct of the salesmen demonstrated a common pattern. The testimony demonstrates that in three instances no express or implied representations were made in reference to the car sold being new, i.e., Schrauth, Frascino, Kasmarek; in four instances there was no express but, at the most, an implied representation, i.e., Hamming, Hughes, Jahoda, Klaymeier; in one instance the purchaser knew at the time of signing the purchase order that she was purchasing a used car, i.e., Gargalowitz. The approach and the "sales pitch" were so different in the 13 sales that they cannot raise an inference that there was an agreement, adopting the State's language, to "switch" sales.
The State failed on its case to prove, upon its own theory, the three essential steps  advertising, reconditioning, switch sales. In the State's view the conspiracy to defraud included all three elements. Failure to prove any one would, therefore, result in a vital defect in proof.
Accepting as true all proofs offered by the State at the close of its case, together with all inferences which can logically be drawn therefrom, I am convinced that the proof was insufficient to permit the jury to logically infer the existence of a conspiracy among the defendants. I conclude, therefore, that the trial judge erred in denying defendants' motion for a judgment of acquittal and for that reason the judgment appealed should be reversed.
Additionally, insofar as three defendants are concerned, there was insufficient proof to link any of them with the alleged conspiracy.
The only proof concerning defendant Halsey Automobile Co. is that the title to some of the vehicles sold came through *53 that corporation to Halsey-Packard, Inc. In one instance title was transferred directly from Halsey Automobile Co. to the purchaser. There is no other proof of that corporation's association with the other defendants. This proof is insufficient to sustain a conviction of that corporate defendant.
James Graziani was not shown to have any connection with the alleged conspiracy except in ordering new speedometers installed for damaged speedometers and in occasionally delivering advertising copy.
James Morese participated in only two sales and then clearly wrote on the face of the purchase order a legend denoting that it was a sale of a used car. In only one of these sales is he alleged to have implied that the vehicle was a new car.
The trial court, in any event, should have granted the specific individual motions for acquittal of Halsey Automobile Co., James Graziani and James Morese.